1    [SEE SIGNATURE PAGE FOR COUNSEL]

2

3

4

5

6

7

8                       UNITED STATES DISTRICT COURT

9                    NORTHERN DISTRICT OF CALIFORNIA

10                       SAN FRANCISCO DIVISION

11   AUGME TECHNOLOGIES, INC.,              Case No. C 09-5386 JCS

12              Plaintiff,                  **AUGME TECHNOLOGIES, INC.'S
                                            OPENING CLAIM CONSTRUCTION
13        v.                                BRIEF**

14   YAHOO INC.,

15              Yahoo.

16                                          Date:  August 11, 2011
17   YAHOO INC.,                            Time:  9:30 a.m.
                                            Courtroom:  A, 15th Floor
18              Counterclaim Plaintiff,     Honorable Joseph C. Spero

19        v.

20   AUGME TECHNOLOGIES, INC. and
     WORLD TALK RADIO, LLC,
21
                Counterclaim Yahoos.
22

23

24

25

26

27

28

# Table of Contents

**Page**

I. INTRODUCTION .................................................................................................... 1

II. THE PATENTED TECHNOLOGY ........................................................................ 2

III. LEGAL PRINCIPLES ........................................................................................... 3

IV. ANALYSIS ............................................................................................................. 5

      1. "to add function to a Web page" ................................................................ 5
      2. "embedded in said Web page" and "embedded therein" ............................ 8
      3. "service response" ................................................................................... 11
      4. "code module" ......................................................................................... 13
      5. "in response to said first and second information," "responsive to
          said first and second information," and "in response to said
          information" .............................................................................................. 15
      6. "initiating execution of said second code module" .................................. 16
      7. "means for communicating a Web address of said Web page to a
          server system via a network connection to initiate a download of a
          second computer readable code module to said client machine" ............... 17
      8. "means for communicating first information characterizing said
          Web browser to said server system" ........................................................ 18
      9. "means for assembling, at said server system, said second computer
          readable code module, said second computer readable code module
          containing a service response related to said Web page, said second
          computer readable code module being responsive to said first and
          second information" ................................................................................. 20
      10. "means for communicating said second code module to said second
          processor platform, such that upon retrieving said second code
          module, said first code module issues a second command to initiate
          execution of said second code module at said second processor
          platform" ................................................................................................. 22

V. CONCLUSION ..................................................................................................... 24

AUGME TECHNOLOGIES, INC.'S OPENING CLAIM CONSTRUCTION BRIEF

LIBA/2163871.4

1

## TABLE OF AUTHORITIES

2

Page(s)

3

CASES

4

*AllVoice Computing PLC v. Nuance Commc'ns, Inc.*,
   504 F.3d 1236 (Fed. Cir. 2007) .................................................................................... 5

5

6

*Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*,
   632 F.3d 1246 (Fed. Cir. 2011) ................................................................................... 12

7

*C.R. Bard, Inc. v. U.S. Surgical Corp.*,
   388 F.3d 858 (Fed. Cir. 2004) ...................................................................................... 3

8

9

*Comark Commc'ns, Inc. v. Harris Corp.*,
   156 F.3d 1182 (Fed. Cir. 1998) ............................................................................... 7, 10

10

11

*Finisar Corp. v. DirecTV Group, Inc.*,
   523 F.3d 1323 (Fed. Cir. 2008) ............................................................................... 5, 23

12

*Harris Corp. v. Ericsson Inc.*,
   417 F.3d 1241 (Fed. Cir. 2005) .................................................................................... 5

13

14

*Home Diagnostics, Inc. v. LifeScan, Inc.*,
   381 F.3d 1352 (Fed. Cir. 2004) .................................................................................... 9

15

*Interactive Gift Express, Inc. v. Compuserve, Inc.*,
   256 F.3d 1323 (Fed. Cir. 2001) ................................................................................... 15

16

17

*Markman v. Westview Instruments, Inc.*,
   52 F.3d 967 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996) ............................. 3, 4, 15

18

19

*Micro Chem., Inc. v. Great Plains Chem. Co.*,
   194 F.3d 1250 (Fed. Cir. 1999) ................................................................................. 4, 5

20

21

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) (en banc) ................................................................. 3, 4, 15

22

*Serrano v. Telular Corp.*,
   111 F.3d 1578 (Fed. Cir. 1997) .................................................................................... 4

23

24

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
   299 F.3d 1313 (Fed. Cir. 2002) ................................................................................ 3, 4

25

26

*WMS Gaming, Inc. v. Int'l Game Tech.*,
   184 F.3d 1339 (Fed. Cir. 1999) .................................................................................... 5

27

28

iii

1   **STATUTES**

2   35 U.S.C. § 112, ¶6 ............................................................................................ 4, 5, 23

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

AUGME TECHNOLOGIES, INC.'S OPENING CLAIM CONSTRUCTION BRIEF

LIBA/2163871.4

1

**TABLE OF EXHIBITS**

2

| Exhibit 1 | U.S. Pat. 6,594,691 |
|---|---|
| Exhibit 2 | U.S. Pat. 7,269,636 |
| Exhibit 3 | Excerpt pages from Gary Nutt rough deposition transcript, taken April 6, 2011 |
| Exhibit 4 | File History for U.S. Pat. 6,594,691 |
| Exhibit 5 | U.S. Pat. 6,317,761 |
| Exhibit 6 | The Computer Glossary by Alan Freedman (9th ed., 2001) |
| Exhibit 7 | Email from Gregory Bishop to Ryan Gilfoil, dated March 29, 2011 |
| Exhibit 8 | Email exchange between Gregory Bishop and Daniel P. Muino, dated March 29, 2011 through April 8, 2011 |

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Augme Technologies, Inc.'s Opening Claim Construction Brief

LIBA/2163871.4

1   **I.      INTRODUCTION**

2          Plaintiff Augme Technologies, Inc. ("Augme") submits its Opening Claim Construction

3   Brief in support of its construction of certain claim terms in U.S. Patent Nos. 6,594,691 ("the '691

4   patent") and 7,269,636 ("the '636 patent") (collectively "the patents-in-suit").[1]  The '691 patent

5   was filed on October 28, 1999.  (Ex. 1.)  The '636 patent is a continuation of the '691 patent.  It

6   was filed on July 1, 2003, and claims priority back to October 28, 1999.  (Ex. 2.)

7          The claim construction process asks the Court to resolve disputes between parties as to the

8   meaning of claim terms.  Here, the disputes are straightforward.  While Augme contends that the

9   language of the claims should be followed, as informed by the intrinsic evidence, Defendant

10  Yahoo! Inc. ("Yahoo") seeks to import limitations from the preferred embodiment of the

11  specification, from other claims in the patents, and from selected extrinsic evidence.  Following

12  proper claim construction principles, there is no reason to import the numerous additional

13  limitations introduced by Yahoo's proposed construction.  The claims should be construed to

14  remain faithful to the claim language.

15         Pursuant to the Court's Order (Dkt. No. 119), the parties have limited the number of terms

16  to be construed at this time to ten, as follows:

17         1. "*to add function to a Web page*" (JCCS Term #1);

18         2. "*embedded in said Web page*" and "*embedded therein*" (JCCS Term #2;

19         3.  "*service response*" (JCCS Term #3);

20         4. "*code module*" (JCCS Term #4);

21         5. "*in response to said first and second information*," "*responsive to said first and second*

22         *information*," and "*in response to said information*" (JCCS Term #5);

23         6. "*initiating execution of said second code module*" (JCCS Term #6);

24         7. "*means for communicating a Web address of said Web page to a server system via a network*

25  *connection to initiate a download of a second computer readable code module to said client machine*"

---

[1] The exhibits referenced in this brief are attached to the Declaration of Gregory S. Bishop in Support of Augme's  Claim Construction Brief ("Bishop Decl.") filed herewith, and will be referred to hereafter as "Ex. _."

1

(JCCS Term #15);

8.  "*means for communicating first information characterizing said Web browser to said server system*" (JCCS Term #16);

9.  "*means for assembling, at said server system, said second computer readable code module, said second computer readable code module containing a service response related to said Web page, said second computer readable code module being responsive to said first and second information*" (JCCS Term #18); and

10.  "*means for communicating said second code module to said second processor platform, such that upon retrieving said second code module, said first code module issues a second command to initiate execution of said second code module at said second processor platform*" (JCCS Term #21).


## II.     THE PATENTED TECHNOLOGY

The patents-in-suit are generally directed to the manner in which tailored content is provided in a Web page.  (Ex. 1 at 1:5-10.)  This process is described in the patents-in-suit as "adding function to Web pages."  (*Id*.)  The "function" or "tailored content" that is added to the Web page may include advertisements, music, videos, and the like.  (*Id*. at 12:56-13:3 and 14:34-45.)

To add tailored content, the patents-in-suit disclose a system and method in which a Web page includes computer program instructions (a first code module).  (*Id*. at 4:61-5:6.)  These computer program instructions gather information about the Web page, the Web browser, and the computer running the Web browser and communicate this information to a server that provides content (*e.g.*, advertisements).  (*Id*. at 6:20-28.)  The server uses the information provided by the first code module to assemble and deliver tailored content (*e.g.*, an advertisement for barbecues for a Web page containing Texas cooking content) to the Web page.  (*Id*. at 11:66-12:3; 12:56-13:3; 14:34-45.)

AUGME TECHNOLOGIES, INC.'S OPENING CLAIM CONSTRUCTION BRIEF

LIBA/2163871.4

### III.    **LEGAL PRINCIPLES**

Courts have the power and the obligation to construe as a matter of law the meaning of language used in patent claims.  *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).  Claim construction begins with the words of the claim, and the claims of the patent define the patented invention to which the patentee is entitled the right to exclude.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc).

Claim terms "'are generally given their ordinary and customary meaning'[, which] is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application."  *Phillips*, 415 F.3d at 1312-13 (citations omitted).  "The 'ordinary meaning' of a claim term is its meaning to the ordinary artisan after reading the entire patent."  *Id*. at 1321.  While the "claims 'must be read in view of the specification, of which they are a part,'" *id*. at 1315 (citation omitted), the Federal Circuit has admonished against the "cardinal sin" of reading limitations from the specification into the claim, *id*. at 1320.

The Federal Circuit has also repeatedly admonished against any claim construction exercise that attempts to limit the scope of the claims by the number of embodiments described in the specification.  *Phillips*, 415 F.3d at 1323; *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1327 (Fed. Cir. 2002) ("In sum, the number of embodiments disclosed in the specification is not determinative of the meaning of disputed claim terms.  As we explained in *CCS Fitness*, an accused infringer cannot overcome the 'heavy presumption' that a claim term takes on its ordinary meaning simply by pointing to the preferred embodiment or other structures or steps disclosed in the specification or prosecution history.").

In claim construction, courts examine the patent's intrinsic evidence to define the patented invention's scope.  *Phillips*, 415 F.3d at 1312-19; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004).  The most probative evidence of the meaning of a patent claim term is to be found in the intrinsic record, *i.e.*, the claims themselves, the specification, and to a lesser

1  extent, the prosecution history. *Teleflex*, 299 F.3d at 1325. Although the prosecution history may

2  be used to understand the language used in the claims, it cannot "enlarge, diminish, or vary" the

3  limitations in the claims. *Markman*, 52 F.3d at 980 (citations omitted). The prosecution history is

4  less useful for claim construction purposes than the specification because it represents an ongoing

5  negotiation between the Patent & Trademark Office ("PTO") and the applicant, not the final

6  product, and it thus lacks the clarity of the specification. *Phillips*, 415 F.3d at 1317.

7      Extrinsic evidence, which "consists of all evidence external to the patent and prosecution

8  history, including expert and inventor testimony, dictionaries, and learned treatises," may help

9  educate the court regarding the field of the invention, but is unlikely to result in a reliable

10  interpretation of patent claim scope unless considered in the context of the intrinsic evidence. *Id.*

11  at 1317-19. For that reason, extrinsic evidence may be considered, but is generally disfavored as a

12  means of interpreting claim terms. *See id.*

13      Several of the asserted claims of the patents in suit contain elements written in means-plus-

14  function format pursuant to 35 U.S.C. § 112, ¶6. That provision states:

15          An element in a claim for a combination may be expressed as a means or
            step for performing a specified function without the recital of structure,
16          material, or acts in support thereof, and such claim shall be construed to
            cover the corresponding structure, material, or acts described in the
17          specification and equivalents thereof.

18  Section 112, ¶6 requires both identification of the claimed function and identification of the

19  structure in the written description necessary to perform that function. *Micro Chem., Inc. v. Great*

20  *Plains Chem. Co.,* 194 F.3d 1250, 1257-58 (Fed. Cir. 1999). The court may not limit the scope of

21  a means-plus-function claim by adopting a function different from that explicitly recited in the

22  claim. *Id.* "Nor does the statute permit incorporation of structure from the written description

23  beyond that necessary to perform the claimed function." *Id.* at 1258.

24      A means-plus-function claim encompasses all structures in the specification corresponding

25  to that element and equivalent structures. *Id.* Thus, when multiple embodiments in the

26  specification correspond to the claimed function, proper application of Section 112, ¶6 reads the

27  claim element to embrace each of those embodiments. *See, e.g.*, *Serrano v. Telular Corp.*, 111

28

AUGME TECHNOLOGIES, INC.'S OPENING CLAIM CONSTRUCTION BRIEF

LIBA/2163871.4

1   F.3d 1578, 1583 (Fed. Cir. 1997).  By statute, the court must then construe the element to cover

2   the "corresponding structure" and "equivalents thereof" that perform the "specified function."

3   35 U.S.C. §112, ¶6.

4          In the case of a means-plus-function element in which the disclosed structure is a computer

5   or microprocessor programmed to carry out an algorithm or process, the disclosed structure for

6   purposes of the claim construction is the special purpose computer as programmed to perform the

7   disclosed algorithm.  *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1348 (Fed. Cir.

8   1999); *see also Harris Corp. v. Ericsson Inc.*, 417 F.3d 1241, 1253 (Fed. Cir. 2005).  The

9   requirement of an algorithm for computer software-implemented means-plus-function elements is

10  not a rigid one:

11          Thus the patent must disclose, at least to the satisfaction of one of ordinary skill in
            the art, enough of an algorithm to provide the necessary structure under § 112, ¶6.
12          This court permits a patentee to express that algorithm in any understandable
            terms including as a mathematical formula, in prose, *see In re Freeman*, 573 F.2d
13          1237, 1245-46 (CCPA 1978), or as a flow chart, or in any other manner that
            provides sufficient structure.
14

15  *Finisar Corp. v. DirecTV Group, Inc.*, 523 F.3d 1323, 1340 (Fed. Cir. 2008); *see also AllVoice*

16  *Computing PLC v. Nuance Commc'ns, Inc.*, 504 F.3d 1236, 1245 (Fed. Cir. 2007) ("In software

17  cases, therefore, algorithms in the specification need only disclose adequate defining structure to

18  render the bounds of the claim understandable to one of ordinary skill in the art.").  The

19  "structure" is only that which is necessary to perform the function of the clause, *i.e.*, selecting,

20  searching, etc.  *See Micro Chem.*, 194 F.3d at 1258 (reversing the district court for incorporating

21  structure beyond that necessary to perform the claimed functions).

22

23  **IV.   ANALYSIS**

24          **1.   "to add function to a Web page"**

25

| Term | Plaintiff Augme's Construction | Yahoo Yahoo's Construction |
|---|---|---|
| to **add function to a Web page**<br><br>(Ex. 1, claims 19, 20) | "to add tailored content to a Web page" | "to apply to a web page a software device that displays a graphical representation of real world device and that is |

5

| | | |
|---|---|---|
| (Ex. 2, claims 1, 2, 3, 9, 14, 20, 25) | | capable of performing or administering a service or activity" |

The patent specification discloses that "[t]he present invention is able to **tailor the added function** based on information about the Web page in which it is embedded and based on visitor specified preferences." (Ex. 1 at 14:30-33(emphasis added).)[2]  "**The added function**" is described in the patent specification as content in the form of "streaming media or other media services." (*Id*. at 5:30-39.)  The patent specification adds that "[s]ome examples of streaming media include banners, informational feeds using a 'marquee', audio based commercials, and so forth." (*Id*. at 1:49-51.)  Yahoo's expert, Dr. Nutt, testified that streaming media includes streaming audio and streaming video, while other media services includes pausing streaming media and the like.  (Ex. 3 at 24, 26, 47.)

The patent specification describes an example Web page with added function.  (*See, e.g.*, Ex. 1 at 5:35-39.)  Fig. 4 illustrates the example Web page, in which the streaming audio of a radio (*SurfNet radio*) is added to a web page.  Because the website is dedicated to Texas Cooking, the streaming audio is tailored by tuning the radio to a country music station.  (*Id*. at 12:56-60.)

The "radio" in Figure 4 is an example of a virtual device displayed on the Web page.  The patent specification refers to such a virtual device as "media appliance metaphors." (*Id*. at 5:40-43.)  The patent specification teaches that a media appliance metaphor "is a software device that exists in the realm of electronic communication and has a counterpart in the real world." (*Id*.)

Country music represents one type of tailored content or "added function" provided by media appliance metaphor 111.  The patent also discloses that "[i]n connection with music provided through radio channel 252, commercials may be aired that are related to the information content of Web page 34." (*Id*. at 12:63-66.)  In other words, the patent discloses **adding** function in the form of **tailored content to a Web page**, wherein the "content" is streaming media in the form of an advertisement.  (*Id*. at 13:1-3.)

---

[2] For clarity, citations to the specification of the patents-in-suit are generally made only to the '691 patent because the '691 and '636 patents share the same specification.

AUGME TECHNOLOGIES, INC.'S OPENING CLAIM CONSTRUCTION BRIEF

LIBA/2163871.4

1    In this example, the tailored content is provided by metaphor 111, but the patent

2   specification discloses that the added function need not be provided by a metaphor.  A metaphor is

3   only one example of a device that adds function:

> Although the present invention is described in connection with the
> presentation of media appliance metaphor 111 as applied to Web page 34,
> it need not be limited to such a media appliance metaphor.  Rather first
> code module 36 (FIG. 2) can be embedded in a Web page to be executed
> by a visiting processor platform in order to execute other code modules
> not associated with media appliance metaphors.

8   (*Id.* at 5:63-6:2.)  "Furthermore, although the present invention is described in connection with a

9   media appliance metaphor for providing streaming audio, this is not intended to be limiting."  (*Id.*

10  at 14:41-43.)

11   Augme's proposed construction – "to add tailored content to a Web page" – properly

12  reflects the description in the patent specification and does not require function to be added by a

13  metaphor.

14   In contrast, Yahoo's construction improperly substitutes the requirement of adding

15  "function" to a web page with a new requirement of adding a "media appliance metaphor" to the

16  web page ("to apply to a web page a software device that displays a graphical representation of

17  real world device….").  This contradicts the patent specification, which unambiguously states that

18  a metaphor is merely one device that provides added function.  (*Id.* at 5:63-6:2; and 14:39-43.)  It

19  further contradicts the express language of the patent specification which states that function may

20  be "streaming media or other media services."  It is also improper under established Federal

21  Circuit law cautioning against reading examples into the claims.  *See Comark Commc'ns, Inc. v.*

22  *Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998).

23   Moreover, Yahoo's proposed construction is circular and makes no sense.  Media

24  appliance metaphors as disclosed in the patent specification are examples of a type of software

25  device that provides added function, such as streaming media and other media services.  The

26  media appliance metaphor is not the function itself.  Yahoo's claim construction expert, Dr. Nutt,

27  acknowledges that "streaming media" is a service, and that the radio in Figure 4 provides the

28

7

service of streaming media.  (Ex. 3 at 40-43.)  Dr. Nutt also confirms what the patent

unambiguously teaches, that streaming media is a function.  (*Id.* at 45-46.)  Therefore, Yahoo's

proposed construction defining "function: as a software device that displays a graphical

representation of a real world device and that is capable of performing or administering a service

or activity" is circular.  Effectively, under Yahoo's interpretation, the "radio" ("a software device

…") in the preferred embodiment is a function and the service provided by the radio ("streaming

audio") is also a function.  Yahoo's proposed construction, which cannot be reconciled with the

preferred embodiment, cannot be correct.

Accordingly, in light of the claim language and the intrinsic record, the Court should

construe "to add function to a Web Page" as "to add tailored content to a Web page."

**2.   "embedded in said Web page" and "embedded therein"**

| Term | Plaintiff Augme's Construction | Yahoo Yahoo's Construction |
|---|---|---|
| Code module … **embedded in said Web page**<br><br>Code module … **embedded therein**<br><br>(Ex. 1, claims 19, 20, 21, 25)<br><br>(Ex. 2, claims 1, 2, 3, 9, 14, 20, 25) | "inserted in a Web page" | "written into the HTML code of the web page when the web page developer designs the web page" |

One of ordinary skill in the art reading the claims, the specification, and the file history

would understand the term "embedded in said web page" or "embedded therein" to mean "inserted

in a Web page."  (Keller Decl. ¶6.)

The patent specification describes "a Web page 34 in which a first code module 36 is

embedded."  (Ex.1 at 3:50-52.)  While the patent specification uses the term "embedded," it does

not limit the term beyond its understanding to one skilled in the art.  A first code module can be

embedded or inserted in a Web page in a number of ways (Keller Decl. ¶7)[3], and the patent is not

---

[3] "Keller Decl." refers to the Declaration of Dr. Arthur Keller In Support Of Augme Technologies, Inc.'s Claim Construction Brief, filed herewith.

AUGME TECHNOLOGIES, INC.'S OPENING CLAIM CONSTRUCTION BRIEF

1    limited to any one method (Ex.1 at 4:61-65 and 14:39-40).

2         One method for embedding code into a Web page is to provide some of the code in one file

3    with a reference to other code in another separate file.  (Keller Decl. ¶8; *see also*, Ex. 1, FIG. 2.)

4    This manner of embedding code is discussed in the file history of the '691 patent with respect to

5    the *Landsman* reference.  (Ex. 4 at 128-30.)  The Patent Examiner stated that the *Landsman*

6    reference discloses "a first code module, i.e. an advertising tag 40, **embedded** in the Web page."

7    (*Id.* at 128 (emphasis added); *see also*, Ex. 5 at 17:37-51.)  A portion of *Landsman's* embedded

8    advertising tag 40 is stored in an external file called "loadad.js", and referenced by the code

9    ("SRC=http://unicast.com/loadad.js").  (Ex. 5 at 17:55-58.)  The patentee did not dispute the

10   Examiner's contention that advertising tag 40 was "embedded" in the code module, despite

11   portions of advertising tag 40 being located in a separate file.  (Ex. 4 at 128-131.)  To the contrary,

12   the applicant acknowledged that loadad.js is fully downloaded  and executed by the browser.  (*Id.*

13   at 129.)  *See Home Diagnostics, Inc. v. LifeScan, Inc.*, 381 F.3d 1352, 1358–59 (Fed. Cir. 2004)

14   (relying on usage of term in art of record to construe claim term).

15        Those skilled in the art recognize that code may also be embedded into a code module with

16   Server Side Includes (SSI).  (Keller Decl. ¶9.)  For example, if a web site included multiple Web

17   pages with common content, the common content could be put into a file and then "included" in

18   the HTML of each Web page using an SSI.  (*Id.*)  By using an SSI, the content could be inserted in

19   all the Web pages without the need for each Web page to have a copy of the common content.

20   (*Id.*)

21        Another method for embedding a code module is the use of frames (or an equivalent) in a

22   Web page.  (Keller Decl. ¶10.)  A frame set references other documents to fill in each frame.  (*Id.*)

23   And, a document could be a code module.  (*Id.*)  For example, a Web page could be a single

24   frame.  (Keller Decl. ¶10.)  The frame can be stored as a separate file or in the same file with the

25   Web page.  (*Id.*)  The Web page will consist of a call to insert the frame, which will fill in the page

26   with documents referenced in the frame.  (*Id.*)  Conceptually, the Web page includes the

27   documents referenced by the frame because they are inserted in the Web page when the Web page

28

AUGME TECHNOLOGIES, INC.'S OPENING CLAIM CONSTRUCTION BRIEF

LIBA/2163871.4

1 is put together.  (*Id*.)

2      Alternatively, a third method is to simply insert all the lines of the code module into the

3 Web page so that no further files or code need to be accessed when the Web page is executed.

4 (Keller Decl. ¶11.)

5      Regardless of the method used, each method embeds a code module in a Web page.

6 Augme's proposed construction – inserted in a Web page – reflects this, and one of ordinary skill

7 in the art would have the same understanding when reading the patents-in-suit.  (Keller Decl. ¶¶6-

8 11.)

9      Yahoo's proposed construction, on the other hand, requires that a code module be "written

10 into the HTML code of the web page when the web page developer designs the web page."  Thus,

11 under Yahoo's construction, any code that is included by reference to another file other than the

12 HTML of the web page would not be "embedded" code.  This definition is contrary to the file

13 history which expressly acknowledged the common understanding of those skilled in the art that

14 code is embedded, even if it is included in the HTML file by reference to another file.  Such a

15 definition is also artificially narrow because it precludes (at least) the use of frames and SSI as

16 methods of embedding code modules in a Web page, and one skilled in the art at the time of the

17 invention would understand frames and SSI as methods of embedding code modules in a Web

18 page.

19      Moreover, the patent specification does not limit the means by which code can be

20 embedded in a Web page.  (Ex. 1 at 4:61-65 and 14:39-40.)  Indeed, the passage Yahoo cites in

21 support of its definition begins by stating "FIG. 2 shows an **example** format of first code module

22 36 in accordance with the **preferred embodiment** of the present invention."  (*Id*. at 4:61-63

23 (emphasis added).)  Yahoo's definition reads these limitations from a single embodiment into the

24 claim term, and doing so is improper under Federal Circuit law.  *See Comark Commc'ns, Inc. v.*

25 *Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998).

26

27

28

AUGME TECHNOLOGIES, INC.'S OPENING CLAIM CONSTRUCTION BRIEF

LIBA/2163871.4

3. **"service response"**

| Term | Plaintiff Augme's Construction | Yahoo Yahoo's Construction |
|---|---|---|
| **Service response**<br><br>(Ex. 1, claims 19, 20, 21, 25)<br><br>(Ex. 2, claims 1, 2, 3, 9, 14, 20, 25) | "a response indicating a denial, customized or default service to be rendered (displayed) on a Web page" | "a response correlated with the URL of the downloaded web page that indicates whether the downloaded web page is permitted to have access to a requested function, and if yes, how the function should be presented on the web page" (Ex. 7 at 2.) |

The patent specification explicitly teaches that a "service response" is a response *"indicating a denial of service"* (Ex. 1 at 7:55-56); *"indicating a conditional service*, i.e., presentation of media appliance metaphor 111 that has been *customized* as a result of the activities associated with task 168." (*Id*. at 8:49-53); and *"indicating a predetermined service"* (*Id*. at 9:24-29.) Augme's proposed construction directly reflects this teaching from the specification.

The patent specification describes how a "service response" operates in a preferred embodiment with a "media appliance metaphor 111 functioning to provide streaming media, in this case music, along with Web page 34." (*Id*. at 7:56-59.) The specification identifies three types of responses indicated by a service response: denial, customized, and default services. (*Id*. at 7:36-9:34.) A service response indicating denial of service "may be the media appliance metaphor 111 having a slash through it," or it "may simply be an absence of any media appliance metaphor." (*Id*. at 7:59-63.) A service response indicating a customized service "may include, but is not limited to music formats tailored to fit the profile, or personality, of Web page 34, the appearance of metaphor 111, the names and formats of the radio channels, the banners that are displayed, the specific type of informational feeds, and so forth." (*Id*. at 8:25-35.) A service response indicating a predetermined or default service is determined by the entity controlling the server system, and "the controlling entity can determine the look and feel of media appliance metaphor 111 (FIG. 4), the particular audio format to be used with media appliance metaphor 111, for example a particular music type, the controls available to a visitor to Web page 34, and so forth." (*Id*. at 9:6-14.)

LIBA/2163871.4

In each case, streaming media provided by the service response (metaphor) is to be rendered on a Web page.  Thus, a "service response" means "a response indicating a denial, customized or default service to be rendered (displayed) on a Web page."

Yahoo's proposed construction improperly reads extraneous limitations into the claim elements by proposing that a "service response" be "a response correlated with the URL of the downloaded web page…."  This construction ignores the claim language and the differences between the claims.  For example, claim 23 of the '636 patent requires "storing … said service response in association with a Web address of said web page."  (Ex. 2.)  But, claims 1, 14, and 20 of the '636 patent do not have this limitation.  (*Id.*)  Instead, claims 1 and 14  merely require "having a service response," while claim 20 requires "having a service response" that is "formed in response to said information."  (*Id.*)  Claim 23, which depends from claim 20, adds the additional limitation that the "service response [is] in association with a Web address of said Web page."  (*Id.*)  Under Yahoo's claim construction, this added limitation of dependent claim 23 would be extraneous.  Similarly, claims 1 and 19 of the '691 patent require "a service response related to said Web page" but do not require it to be associated with a URL or a Web address.  (Ex. 1.)  Rather, dependent claim 6 adds the limitation that the service response be stored "in association with said Web address."  (*Id.*)  Again, Yahoo's constructions would make the additional limitation in dependent claim 6 superfluous.  Finally, claim 21 of the '691 patent includes a requirement that the "service response [is] in association with said Web address" but again does not include the other requirements of Yahoo's proposed construction.  (*Id.*)  On the basis of the claim language alone, Yahoo's proposed construction is improper.  *See Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, 632 F.3d 1246, 1254 (Fed. Cir. 2011) (rejecting proposed construction that "improperly discounts substantive differences between the claims").

Yahoo's proposed construction is also improper because it is not supported by the patent specification.  The patent specification discloses that "[a] service response 162 [is] related to profile 160…."  (Ex. 1 at 8:16-21.)  More specifically, it states that "[t]his profile is important for determining the nature of the interest by a visitor using second processor platform 24 to display

Web page 34 from whence **the profile is produced in order to perform a service response …
related to the profile**."  (*Id*. at 7:40-45 (emphasis added).)  In other words, the patent
specification teaches that the "Service Response Field" shown in Fig. 7 may be related to the
"Profile Field" rather than the "Web Address Field."  Therefore, the "Denial of Service" service
response (162) in the first row is correlated with  RECREATION/GOLF profile (160).  The patent
specification further teaches that the customization provided by the service response "may include,
but is not limited to music formats tailored to fit the profile, or personality, of Web page 34, the
appearance of metaphor 111, the names and formats of the radio channels, the banners that are
displayed, the specific type of informational feeds, and so forth.  (*Id*. at 8:30-35.)

Thus, Yahoo's narrow claim construction requiring that the information in the service
response be limited to being correlated with the URL is not supported by the claim language or
patent specification.

### 4.  "code module"

| Term | Plaintiff Augme's Construction | Yahoo Yahoo's Construction |
|------|-------------------------------|----------------------------|
| **code module**<br><br>(Ex. 1, claims 19, 20, 21, 25)<br><br>(Ex. 2, claims 1, 2, 3, 9, 14, 20, 25) | This claim term does not require construction beyond its plain and ordinary meaning.  To the extent, however, that the Court believes such term requires construction, Augme proposes the following construction:<br><br>"a collection of computer program instructions, which can include data or data structures, for performing computing tasks." | Code module means "a unit of computer program instructions for performing specific computing tasks." |

Augme contends this term should have its plain and ordinary meaning and that any juror
will readily comprehend the meaning of "code module" in the context of the claims.  To the
extent, however, that the Court believes this term requires construction, Augme proposes the
following construction:  "a collection of computer program instructions, which can include data or
data structures, for performing computing tasks."

13

LIBA/2163871.4

1    Support for Augme's definition is found with respect to Figure 2 of the patents, which

2    "shows an example format of first code module 36...." (Ex. 1 at 4:61.) "First code module 36

3    executes enough functionality to act as a 'bootstrap loader' in order to load second code module

4    90 (FIG. 1) into temporary memory 54 (FIG. 1) of second processor platform 24 (FIG. 1) for

5    subsequent execution." (*Id.* at 5:2-6.)

6    Computer program instructions can include data or data structures. For instance, the patent

7    specification discloses computer program instructions that "communicate **Web address** 38 to

8    server system 26 through the execution of first command line 92 ...." (Ex. 1 at 6:20-23 (emphasis

9    added).) A Web address is data that is included in a computer program instruction. The

10   specification also discloses computer program instructions that "communicate **browser**

11   **information** 56 (FIG. 1) and **platform information** 58 (FIG.1), through the execution of first

12   command line 92, to server system 26." (*Id.* at 6:24-28 (emphasis added).) This information is

13   data that is included in the computer program instructions. Therefore, one of ordinary skill in the

14   art reading the claims, the specification, and the file history would understand computer program

15   instructions can include data or data structures. (Keller Decl. ¶12; *see also*, Ex. 6 at 64 ("code":

16   "A set of machine symbols that represents data or instructions").) Thus, Augme's proposed

17   construction is supported by the patent specification.

18   Yahoo's proposed construction, on the other hand, is not supported by the patent

19   specification. Yahoo's proposed construction includes the term "unit" to limit its definition. This

20   term is vague, and Yahoo does not provide intrinsic or extrinsic support describing what is meant

21   by a "unit of computer instructions." Dr. Nutt admits that a unit may be comprised of multiple

22   subassemblies, making the term misleading to the jury, not helpful to them. (Ex. 3 at 111.)

23   Moreover, the file history makes clear that the *Landsman* patent described above in which the

24   code module is separated across multiple files is "one functional code module." (Ex. 4 at 129.)

25   So, while the parties apparently do not dispute that code module need not be limited to a

26   single file or subassembly, Yahoo's attempt to introduce the word "unit" will create uncertainty in

27   the minds of the jury as to what constitutes a "unit." In effect, Yahoo's proposed construction

28

14

1   creates more uncertainty, and will likely lead to conclusions by the jury that are contrary to the

2   intrinsic record.  This is counter to the purpose of the *Markman* process.

3       **5.   "in response to said first and second information," "responsive to said first and second information," and "in response to said information"**

| Term | Plaintiff Augme's Construction | Yahoo Yahoo's Construction |
| --- | --- | --- |
| assemble said second code module **in response to said first and second information**<br><br>said second computer readable code module being **responsive to said first and second information**<br><br>assembling said second code module **in response to said information**<br><br>(Ex. 1, claims 19, 20, 25)<br><br>(Ex. 2, claim 14) | "In response to said information" means "such that the second code module is assembled using said information to target the second code module to said Web page." | In response to said first and second information or responsive to said first and said information means "such that the second code module is compatible with the web browser and client machine combination of the web page visitor."  In response to said information means "such that the second code module is compatible with the web browser or computer processor of the web page visitor." |

17          The claim language is clear and no further construction is required.  The phrase "in

18   response to" is simple and well-understood by a jury.  In the first instance, it is the claim language

19   itself that controls the meaning of the claims.  *Markman*, 52 F.3d at 979; *see also*, *Phillips*, 415

20   F.3d at 1312; *Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1331 (Fed. Cir.

21   2001).  Substituting other words to replace a phrase already well understood by the jury invites the

22   introduction of unwarranted limitations.  Indeed, that is exactly Yahoo's intention here – a bald

23   attempt to add the concept of compatibility to a claim that does not have such a requirement.

24          Whereas the claim is directed to taking action "in response to" certain information, Yahoo

25   seeks to turn this into a requirement that the response lead to compatibility with the Web browser

26   or client machine.  There is nothing in the intrinsic record to justify importing this additional

27   limitation into the claim.

28

AUGME TECHNOLOGIES, INC.'S OPENING CLAIM CONSTRUCTION BRIEF

LIBA/2163871.4

The patent specification describes the assembly of the second code module in response to certain information including a service response, which may be customized.  (*Id*. at 8:45-48.) Such customization may be determined "using said information to target the second code module to said Web page."  (*See id*. at 14:30-33.)  Thus, the term "in response to said information [said first and second information]" means "such that the second code module is assembled using said information [said first and second information] to target the second code module to said Web page."

**6.   "initiating execution of said second code module"**

| Term | Plaintiff Augme's Construction | Yahoo Yahoo's Construction |
|---|---|---|
| **initiating execution of said second code module**<br><br>(Ex. 2, claims 1, 2, 3, 9, 14, 20, 25) | This claim term does not require construction beyond its plain and ordinary meaning.  To the extent, however, that the Court believes such term requires construction, Augme proposes the following construction:<br><br>"causing to begin execution of a code module" | Second command to initiate execution of second code module or initiating execution of said second code module means "the first code module, as distinguished from the browser, instructs the second code module to begin executing." |

Augme contends this term should have its plain and ordinary meaning and that any juror will readily comprehend the meaning of "initiating execution of said second code module" in the context of these claims.  To the extent, however, that the Court believes such term requires construction, Augme proposes the following construction:  "causing to begin execution of a code module."

Yahoo's proposed construction is improper because it reads in limitations from independent claim 1 in the '636 patent that are not in independent claims 14 and 20.  Claim 1 of the '636 patent requires "**said first code module issuing** a second command to initiate execution of said second code module."  (Ex. 2 at 14:63-64 (emphasis added).)  In contrast, claims 14 and 20 require " initiating execution of said second code module."  These claims do not specify that a first code module initiates the execution of the second code module, indeed the claims are silent as to

1  the source of the initiation.  Thus, it would be improper to construe this element to require "a first

2  code module" to initiate execution.

3      **7.   "means for communicating a Web address of said Web page to a server system
         via a network connection to initiate a download of a second computer readable
4        code module to said client machine"**

| Term | Plaintiff Augme's Construction | Yahoo Yahoo's Construction |
|---|---|---|
| means for communicating a Web address of said Web page to a server system via a network connection to initiate a download of a second computer readable code module to said client machine<br><br>(Ex. 1, claims 19, 20) | <u>Function</u>:  communicating a Web address of said Web page to a server system via a network connection to initiate a download of a second computer readable code module to said client machine.<br><u>Structure</u>:  a computer programmed with special-purpose software modules to execute an algorithm, which includes the steps of:  (1) accessing a Web page on the Internet through a first Web address, the Web page having an embedded first computer readable code module; (2) moving a copy of the Web page into temporary memory; (3) initializing a first command to activate a second Web address for contacting a server system; (4) communicating over a network connection, via the first command, the first Web address to the server system; and (5) initiating the download of a second computer-readable code module, and structural equivalents thereof. | <u>Function</u>:  The recited function is "communicating a Web address of said Web page to a server system via a network connection to initiate a download of a second computer readable code module to said client machine."<br><br><u>Structure</u>:  The '691 Patent lacks any adequate disclosure of corresponding structure for this limitation.  Accordingly, the claims including this limitation are invalid for indefiniteness under 35 U.S.C. § 112 ¶ 2. |

24      The patent specification discloses the structure for the algorithm to perform the claimed

25  function of "communicating a Web address of said Web page to a server system via a network

26  connection to initiate a download of a second computer readable code module to said client

27  machine" as follows:

28                                      17

AUGME TECHNOLOGIES, INC.'S OPENING CLAIM CONSTRUCTION BRIEF

LIBA/2163871.4

| Step | Patent Specification Citation |
|---|---|
| 1 and 2 | With reference back to FIG. 3, Web page display process 110 begins with a task 112. Task 112 causes Web browser 52 to download Web page 34 at second processor platform 24. In other words, Web browser 52 moves a copy of Web page 34, with the embedded first code module 36 into temporary memory 54 (FIG. 1) of second processor platform 24. (Ex. 1 at 6:3-8.) |
| 3 | When Web page 34 is downloaded at second processor platform 24 in task 112, a task 114 is performed. Task 114 causes Web browser 52 to automatically execute first code module 36 embedded in Web page 34, a copy of which is now stored in temporary memory 54. (*Id*. at 6:9-13.) |
| 4 | Task 118 causes second processor platform 24 to communicate Web address 38 to server system 26 through the execution of first command line 92…. (*Id*. at 6:20-23.) |
| 5 | That is, as server system 26 communicates second code module 90 to second processor platform 24, task 244 causes platform 24 to receive, via network connection 96 (FIG. 1), second code module 90. (*Id*. at 12:31-35.) |

Based at least on this disclosure, one of ordinary skill in the art would readily discern the disclosed algorithm for performing the claimed function of "communicating a Web address of said Web page to a server system via a network connection to initiate a download of a second computer readable code module to said client machine." (Keller Decl. ¶13.) A person of ordinary skill in the art at the time of the invention would have known how to program a computer system to perform each step of the disclosed algorithm. (Keller Decl. ¶19.)

### 8. "means for communicating first information characterizing said Web browser to said server system"

| Term | Plaintiff Augme's Construction | Yahoo Yahoo's Construction |
|---|---|---|
| means for communicating first information characterizing said Web browser to said server system (Ex. 1, claims 19, 20) | Function: communicating first information characterizing said Web browser to said server system. Structure: a computer programmed with special-purpose software modules to execute an algorithm, which includes the steps of: (1) | Function: The recited function is "communicating first information characterizing said Web browser to said server system." Structure: The '691 Patent lacks any adequate disclosure of corresponding structure for this limitation. Accordingly, the claims including this |

| | storing in memory a Web browser program and information characterizing the Web browser; (2) accessing a Web page through a first Web address using the Web browser, the Web page having an embedded first code module; (3) initiating a first command in the first code module to activate a second Web address for contacting a server system; and (4) communicating over a network connection to the server system via the first command, the first Web address and the information characterizing the Web browser, and structural equivalents thereof. | limitation are invalid for indefiniteness under 35 U.S.C. § 112 ¶ 2. |
|---|---|---|

The patent specification discloses the structure for the algorithm to perform the claimed function of "communicating first information characterizing said Web browser to said server system."

| Step | Patent Specification Citation |
|---|---|
| 1 | Memory 42 includes Web browser software 52 and a temporary memory 54. A first portion of memory 42 is designated for browser information (BROWSER INFO.) 56, and a second portion of memory 42 is designated for platform information (PLATFORM INFO.) 58. (Ex. 1 at 4:4-9.) |
| 2 | With reference back to FIG. 3, Web page display process 110 begins with a task 112. Task 112 causes Web browser 52 to download Web page 34 at second processor platform 24. In other words, Web browser 52 moves a copy of Web page 34, with the embedded first code module 36 into temporary memory 54 (FIG. 1) of second processor platform 24. (*Id*. at 6:3-8.) |
| 3 | When Web page 34 is downloaded at second processor platform 24 in task 112, a task 114 is performed. Task 114 causes Web browser 52 to automatically execute first code module 36 embedded in Web page 34, a copy of which is now stored in temporary memory 54. (*Id*. at 6:9-13.) |
| 4 | Task 118 causes second processor platform 24 to communicate Web address 38 to server system 26 through the execution of first |

19

| | command line 92…. |
|---|---|
| | Next, a task 120 is performed.  Like task 118, task 120 causes second processor platform 24 to communicate browser information 56 (FIG. 1) and platform information 58. (FIG.1), through the execution of first command line 92, to server system 26.  (*Id*. at 6:20-28.) |

Based at least on this disclosure, one of ordinary skill in the art would readily discern the disclosed algorithm for performing the claimed function of "communicating first information characterizing said Web browser to said server system."  (Keller Decl. ¶20.)  A person of ordinary skill in the art at the time of the invention would have known how to program a computer system to perform each step of the disclosed algorithm.  (Keller Decl. ¶26.)

9.  <u>**"means for assembling, at said server system, said second computer readable code module, said second computer readable code module containing a service response related to said Web page, said second computer readable code module being responsive to said first and second information"**</u>

| Term | Plaintiff Augme's Construction | Yahoo Yahoo's Construction |
|---|---|---|
| means for assembling, at said server system, said second computer readable code module, said second computer readable code module containing a service response related to said Web page, said second computer readable code module being responsive to said first and second information<br><br>(Ex. 1, claims 19, 20) | Function:  assembling, at said server system, said second computer readable code module, said second computer readable code module containing a service response related to said Web page, said second computer readable code module being responsive to said first and second information.<br><br>Structure:  a computer programmed with special-purpose software modules to execute an algorithm, which includes the steps of: (1) receiving at a server system a first command communicated over a network from a client machine; (2) receiving at the server system a Web address of a Web page accessed by the client machine and communicated via the first command; (3) receiving at the | Function:  The recited function is "assembling, at said server system, said second computer readable code module, said second computer readable code module containing a service response related to said Web page, said second computer readable code module being responsive to said first and second information."<br><br>Structure:  The '691 Patent lacks any adequate disclosure of corresponding structure for this limitation.  Additionally, the claims including this limitation are inoperative.  Accordingly, the claims including this limitation are invalid for indefiniteness under 35 U.S.C. § 112 ¶ 2. |

20

| | server system first information characterizing a Web browser and second information characterizing a client machine; and (4) executing instructions to assemble a second code module with a service response responsive to the first and second information, and structural equivalents thereof. | |
|---|---|---|

The patent specification discloses the structure for the algorithm to perform the claimed function of "assembling, at said server system, said second computer readable code module, said second computer readable code module containing a service response related to said Web page, said second computer readable code module being responsive to said first and second information."

| Step | Patent Specification Citation |
|---|---|
| 1 | FIG. 1 shows a block diagram of a computer network 20 in accordance with a preferred embodiment of the present invention. Computer network 20 includes a first processor platform 22, a second processor platform 24, and a server system 26. (Ex. 1 at 3:37-41.)<br><br>…<br><br>Task 124 causes processor 62 (FIG. 1) of server system 26 to receive first command 93 (FIG. 3). (*Id.* at 6:39-40.) |
| 2 | At task 126, server system 26 receives Web address 38 communicated by second processor platform 24 at task 118 (FIG. 3) of display process 110 (FIG.3). (*Id.* at 6:42-44.) |
| 3 | Task 190 causes processor 62 (FIG. 1) to receive browser information 56 (FIG. 1) and platform information 58 (FIG. 1) from second processor platform 24 (FIG. 1). (*Id.* at 9:41-43.) |
| 4 | [S]econd code module 90 is assembled in response to browser information 56 and platform information 58. In other words, second code module 90 is assembled to include the service response and to work with any combination of browser/platform systems. (*Id.* at 11:66-12:3.) |

Based at least on this disclosure, one of ordinary skill in the art would readily discern the disclosed algorithm for performing the claimed function of "assembling, at said server system,

AUGME TECHNOLOGIES, INC.'S OPENING CLAIM CONSTRUCTION BRIEF

LIBA/2163871.4

1  said second computer readable code module, said second computer readable code module

2  containing a service response related to said Web page, said second computer readable code

3  module being responsive to said first and second information."  (Keller Decl. ¶27.)  A person of

4  ordinary skill in the art at the time of the invention would have known how to program a computer

5  system to perform each step of the disclosed algorithm.  (Keller Decl. ¶33.)

6  **10. "means for communicating said second code module to said second processor platform, such that upon retrieving said second code module, said first code module issues a second command to initiate execution of said second code module at said second processor platform"**

7

8

| Term | Plaintiff Augme's Construction | Yahoo Yahoo's Construction |
|---|---|---|
| means for communicating said second code module to said second processor platform, such that upon retrieving said second code module, said first code module issues a second command to initiate execution of said second code module at said second processor platform<br><br>(Ex. 1, claims 21, 25) | Function:  communicating said second code module to said second processor platform, such that upon retrieving said second code module, said first code module issues a second command to initiate execution of said second code module at said second processor platform.<br><br>Structure:  a computer programmed with special-purpose software modules to execute an algorithm, which includes the steps of: (1) communicating a second code module from the server system to the second processor platform via a network connection; (2) downloading the second code module to temporary memory at the second processor platform; and (3) issuing a command from the first code module to initiate execution of the second code module by the Web browser, and structural equivalents thereof. | Function:  The recited function is "communicating said second code module to said second processor platform, such that upon retrieving said second code module, said first code module issues a second command to initiate execution of said second code module at said second processor platform."<br><br>Structure:  A server system programmed to communicate the second code module to the second processor platform via a network connection, such that upon receiving the second code module the second processor platform (1) stores the second code module in temporary memory, and (2) executes a command line within the first code module to initiate the execution of the second code module.[4]  (Ex. 8.) |

---

[4] Yahoo provided this new definition of structure to Augme on Friday, April 8, 2011 at 3:11 PM. As Augme's Claim Construction Brief is due the next business day, the parties have had no time to meet and confer regarding this new definition.  (Ex. 8.)

22

The patent specification discloses the structure for the algorithm to perform the claimed function of "communicating said second code module to said second processor platform, such that upon retrieving said second code module, said first code module issues a second command to initiate execution of said second code module at said second processor platform."

| Step | Patent Specification Citation |
|---|---|
| 1 and 2 | Second code module 90 is communicated from ports 78 over Internet 28 and downloaded to temporary memory 54 at second processor platform 24.  (Ex. 1 at 4:58-60.) |
| 3 | Fourth command line 104 contains a second command 106 that initiates execution of second code module 90 that was downloaded to temporary memory 54 of second processor platform 24.  (*Id.* at 5:23-26.) |

Based at least on this disclosure, one of ordinary skill in the art would readily discern the disclosed algorithm for performing the claimed function of "communicating said second code module to said second processor platform, such that upon retrieving said second code module, said first code module issues a second command to initiate execution of said second code module at said second processor platform."  (Keller Decl. ¶34.)  A person of ordinary skill in the art at the time of the invention would have known how to program a computer system to perform each step of the disclosed algorithm.  (Keller Decl. ¶38.)

Yahoo's latest proposed algorithm is not supported by the claim language, specification, or file history.  To begin with, Yahoo's proposed algorithm fails to include the step of "communicating said second code module to said second processor platform," which is required by the claim.  Thus, by definition, Yahoo's algorithm fails to disclose enough of an algorithm to provide the necessary structure under §112, ¶6.  *Finisar Corp. v. DirecTV Group, Inc.*, 523 F.3d 1323, 1340 (Fed. Cir. 2008).

Yahoo's proposed algorithm also fails because the steps that it does identify are also not supported by the claim language, specification, or file history.  Yahoo requires that "the second processor platform … (2) executes a command line within the first code module to initiate the

1    execution of the second code module." There is no requirement that the **second processor**

2    **platform execute** a command line. The claim reads " said first code module issues a second

3    command to initiate execution of said second code module **at said second processor platform**."

4    (emphasis added.)

5          Yahoo also would require execution of "a command **line**," but this improperly reads in a

6    limitation to the claim. There is no requirement that there be "a command line" only "a second

7    command." Yahoo also requires the execution of the command line "**within** the first code

8    module." Again, Yahoo reads in limitations to the claim. The claim requires "said first code

9    module issues a second command," and there is no requirement that the second command be

10   within the first code module. Because Yahoo reads in limitations to the claim, Yahoo's definition

11   is improper.

12   **V.**     **CONCLUSION**

13         For the foregoing reasons, Augme respectfully requests that the Court adopt its proposed

14   claim constructions.

15

16   Dated: April 11, 2011               Respectfully submitted,

17

18                       By:   /s/ Gregory S. Bishop
                           Thomas J. Scott Jr. (pro hac vice)

19                             tscott@goodwinprocter.com
                          Jennifer A. Albert (pro hac vice)

20                             jalbert@goodwinprocter.com
                          GOODWIN PROCTER LLP

21                             901 New York Avenue NW
                          Washington, DC  20001

22                             Telephone: (202) 346-4000
                          Facsimile: (202) 346-4444

23                             Erica D. Wilson (161386)

24                             ewilson@goodwinprocter.com
                          GOODWIN PROCTER LLP

25                             Three Embarcadero Center, 24th Floor
                          San Francisco, CA  94111

26                             Telephone: (415) 733-6000
                          Facsimile: (415) 677-9041

27                             Gregory S. Bishop (184680)

28                             gbishop@goodwinprocter.com

LIBA/2163871.4

Charles F. Koch (256683)
ckoch@goodwinprocter.com
Rebecca Unruh (267881)
runruh@goodwinprocter.com
GOODWIN PROCTER LLP
135 Commonwealth Drive
Menlo Park, CA  94025
Telephone: (650) 752-3100
Facsimile: (650) 853-1038

David R. Shaub (SBN 032322)
Lisbeth Bosshart (SBN 201822)
Robert C. Matz (SBN 217822)
SHAUB & WILLIAMS LLP
12121 Wilshire Boulevard, Suite 205
Los Angeles, CA 90025-1165
Tel: (310) 826-6678; Fax: (310) 826-8042
lawfirm@sw-law.com

David G. Rosenbaum (admitted pro hac vice)
Ayhan E. Mertogul (admitted pro hac vice)
ROSENBAUM & SILVERT, P.C.
1480 Techny Road
Northbrook, IL 60062
Tel: (847) 770-6000; Fax: (847) 770-6006
drosenbaum@rosenbaumsilvert.com

Attorneys for Counterclaim Yahoo
AUGME TECHNOLOGIES, INC.