**United States District Court**
For the Northern District of California

1

2

3

4

5

6                    UNITED STATES DISTRICT COURT

7                    NORTHERN DISTRICT OF CALIFORNIA

8    AUGME TECHNOLOGIES, INC.,                    Case No.  C 09-05386 JCS

9                    Plaintiff(s),

10        v.                                      **CLAIM CONSTRUCTION ORDER**

11   YAHOO!, INC.,

12                    Defendant(s).
     _____/

13

14

15   **I.      INTRODUCTION**

16        On November 16, 2009, Plaintiff Augme Technologies, Inc. ("Augme") filed a complaint

17   alleging infringement by Defendant Yahoo! Inc. ("Yahoo") of the following patents:  1) U.S. Patent

18   Nos. 6,594,691 ("the '691 patent") and 2)  7,269,636 ("the '636 patent") (collectively "the

19   patents-in-suit").  The '636 patent is a continuation of the '691 patent.  Before the Court is the task

20   of construing certain terms used in the '691 and '636 patents.[1]

21   **II.     OVERVIEW OF THE TECHNOLOGY AND THE PARTIES' POSITIONS**

22        The invention disclosed in the '691 patent is entitled "Method and System for Adding

23   Function to a Web Page." Augme's Opening Claim Construction Brief ("Augme Br.") Ex. 1.  Based

24   on the same specification, the '636 patent claims a "Method and Code Module for adding Function

25   to a Web Page."  Augme Br. Ex. 2.  The patents-in-suit disclose a system and method in which a

26   Web page that is downloaded to a client platform includes computer code (a first code module).

27   _____

28        [1]The parties have consented to the jurisdiction of a United States Magistrate Judge pursuant to
     28 U.S.C. § 636(c).

**United States District Court**
For the Northern District of California

1   Augme Br., Ex. 1 at 4:61-5:6.  This computer code sends a command over a network, such as the

2   internet, to a server.  In addition, information about the Web page, the Web browser, and the

3   computer running the Web browser is communicated to the server.  *Id.* at 6:20-28.  The server uses

4   the information provided by the first code module to assemble a second code module, which in turn

5   is sent back to the client and adds function to the Web page.  *Id.* at 11:66-12:3; 12:56-13:3;

6   14:34-45.

7           Several of the disputed terms in the patents-in-suit were construed in separate litigation in the

8   Southern District of New York involving the same Plaintiff.  *See Modavox, Inc. v. Tacoda*, *Inc.* 607

9   F. Supp. 2d 530 (S.D.N.Y. 2009).  The parties have presented ten disputed terms for consideration

10  by this Court.

11  **III.    LEGAL STANDARDS**

12          **A.    Claim Construction Standards**

13          A determination of infringement is a two-step process.  *Wright Med. Tech., Inc. v. Osteonics*

14  *Corp.*, 122 F.3d 1440, 1443 (Fed. Cir. 1997).  The first step is claim construction, which is a

15  question of law to be determined by the court.  *Id*.  The second step is an analysis of infringement, in

16  which it must be determined whether a particular device infringes a properly construed claim.  *Id*.

17  This analysis is a question of fact.  *Id*.

18          "It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to

19  which the patentee is entitled the right to exclude.'"  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312

20  (Fed. Cir. 2005) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d

21  1111, 1115 (Fed. Cir. 2004)).  Generally, claim terms are given the ordinary and customary meaning

22  that would be ascribed to them by a person of ordinary skill in the field of the invention.  *Id*. at 1313;

23  *see also Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001) ("[U]nless

24  compelled to do otherwise, a court will give a claim term the full range of its ordinary meaning as

25  understood by an artisan of ordinary skill").

26          The most "significant source of the legally operative meaning of disputed claim language" is

27  the intrinsic evidence of record, that is, the claims, the specification and the prosecution history.

28  *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).  This is because "the

**United States District Court**

For the Northern District of California

1   person of ordinary skill in the art is deemed to read the claim term not only in the context of the

2   particular claim in which the disputed term appears, but in the context of the entire patent, including

3   the specification." *Phillips*, 415 F.3d at 1313.  In some cases, the specification may reveal a "special

4   meaning" given by the inventor that differs from the meaning the term might otherwise possess. *Id.*

5   at 1316; *see also Irdeto Access, Inc. v. Echostar Satellite Corp*., 383 F.3d 1295, 1300 (Fed. Cir.

6   2004) (holding that where a disputed claim term has "no previous meaning to those of ordinary skill

7   in the art, its meaning, then, must be found elsewhere in the patent.").  In such instances, "the

8   inventor's lexicography governs." *Phillips*, 415 F.3d at 1316.  Similarly, a specification may reveal

9   "an intentional disclaimer, or disavowal, of claim scope by the inventor." *Id.*

10          "[T]he Federal Circuit has held that if commonly understood words are used, then the

11   'ordinary meaning of claim language as understood by a person of skill in the art may be readily

12   apparent even to lay judges, and claim construction in such cases involves little more than the

13   application of the widely accepted meaning of commonly understood words.'" *Board of Trustees of*

14   *Leland Stanford Jr. Univ. v. Roche Molecular Systems, Inc.*, 528 F. Supp. 2d 967, 976 (N.D. Cal.

15   2007) (quoting *Phillips*, 415 F.3d at 1314);  *see also United States Surgical Corp. v. Ethicon, Inc.*,

16   103 F.3d 1554, 1568 (Fed. Cir. 1997) (holding that "[c]laim construction is a matter of resolution of

17   disputed meanings and technical scope, to clarify and when necessary to explain what the patentee

18   covered by the claims, for use in the determination of infringement.  It is not an obligatory exercise

19   in redundancy.").  Thus, in *Board of Trustees of Leland Stanford Junior University v. Roche*

20   *Molecular Systems, Inc.*, the court held that a claim term did not need construction where it was

21   "neither unfamiliar to the jury, confusing to the jury, nor affected by the specification or prosecution

22   history." 528 F. Supp. 2d at 976.

23          A person of ordinary skill in the art also looks to the prosecution history of a patent to

24   understand how the patent applicant and the Patent Office understood the claim terms. *Phillips*, 415

25   F.3d at 1314.  "The prosecution history limits the interpretation of claim terms so as to exclude any

26   interpretation that was disclaimed during prosecution." *Southwall Technologies, Inc. v. Cardinal IG*

27   *Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995).

28

United States District Court

For the Northern District of California

1    While claims are to be construed in light of the specification, courts must be careful not to

2    read limitations from the specification into the claim.  *Phillips*, 415 F.3d at 1323.  If a patent

3    specification describes only a single embodiment, that does not mean the claims of the patent

4    necessarily must be construed as limited to that embodiment.  *Id.*  Rather, it is to be understood that

5    the purpose of the specification "[is] to teach and enable those of skill in the art to make and use the

6    invention" and that sometimes, the best way to do that is to provide an example.  *Id.*  Similarly, the

7    Federal Circuit has cautioned that "patent coverage is not necessarily limited to inventions that look

8    like the ones in the figures," noting that taking such an approach to claim construction would

9    amount to "import[ing] limitations onto the claim from the specification, which is fraught with

10   danger."  *MBO Laboratories, Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1333 (Fed. Cir.

11   2007).

12   Courts may also use extrinsic evidence in construing claim terms if it is necessary, so long as

13   such evidence is not used to "enlarge, diminish, or vary the limitations in the claims."  *Markman,* 52

14   F.3d at 980;  *see also Verve, LLC v. Crane Cams, Inc.*, 311 F.3d 1116, 1119 (Fed. Cir. 2002)

15   ("Patent documents are written for persons familiar with the relevant field; the patentee is not

16   required to include in the specification information readily understood by practitioners, lest every

17   patent be required to be written as a comprehensive tutorial and treatise for the generalist, instead of

18   a concise statement for persons in the field.  Thus resolution of any ambiguity arising from the

19   claims and specification may be aided by extrinsic evidence of usage and meaning of a term in the

20   context of the invention.").  As the court explained in *Markman*, "[extrinsic] evidence may be

21   helpful to explain scientific principles, the meaning of technical terms, and terms of art that appear

22   in the patent and prosecution history."  52 F.3d at 980.  The Federal Circuit has warned, however,

23   that such evidence is generally "less reliable than the patent and its prosecution history. . ."  *Phillips*,

24   415 F.3d at 1318.  Thus, courts are  free to consult dictionaries and technical treatises so long as they

25   are careful not to elevate them "to such prominence . . . that it focuses the inquiry on the abstract

26   meaning of [the] words rather than on the meaning of the claim terms within the context of the

27   patent."  *Phillips*, 415 F.3d at 1321.

28

**United States District Court**
For the Northern District of California

1    In recent years, the Federal Circuit has offered considerable guidance on the role extrinsic

2    evidence should play in claim construction.  In *Phillips*, the Federal Circuit rejected a methodology

3    that it had previously set forth in *Texas Digital Systems, Inc. v. Telegenix, Inc.,* 308 F.3d 1193 (Fed.

4    Cir. 2002) for the use of extrinsic evidence, warning that it placed too great an emphasis on

5    dictionary definitions and other treatises.  415 F.3d at 1321.  The Federal Circuit explained its

6    conclusion as follows:

7         Although the concern expressed by the court in *Texas Digital* was valid, the methodology it
          adopted placed too much reliance on extrinsic sources such as dictionaries, treatises, and
8         encyclopedias and too little on intrinsic sources, in particular the specification and
          prosecution history. While the court noted that the specification must be consulted in every
9         case, it suggested a methodology for claim interpretation in which the specification should be
          consulted only after a determination is made, whether based on a dictionary, treatise, or other
10        source, as to the ordinary meaning or meanings of the claim term in dispute. Even then,
          recourse to the specification is limited to determining whether the specification excludes one
11        of the meanings derived from the dictionary, whether the presumption in favor of the
          dictionary definition of the claim term has been overcome by "an explicit definition of the
12        term different from its ordinary meaning," or whether the inventor "has disavowed or
          disclaimed scope of coverage, by using words or expressions of manifest exclusion or
13        restriction, representing a clear disavowal of claim scope." 308 F.3d at 1204. In effect, the
          *Texas Digital* approach limits the role of the specification in claim construction to serving as
14        a check on the dictionary meaning of a claim term if the specification requires the court to
          conclude that fewer than all the dictionary definitions apply, or if the specification contains a
15        sufficiently specific alternative definition or disavowal. . . . That approach, in our view,
          improperly restricts the role of the specification in claim construction.

16

17   *Id* at 1320.

18        These principals were illustrated in *Nystrom v. TREX Co., Inc.*, 424 F.3d 1136, 1145 (Fed.

19   Cir. 2005).  In that case, the Federal Circuit held that the word "board" encompassed only "wood

20   decking materials cut from a log," even though a few dictionary definitions swept more broadly to

21   include similarly-shaped items made of materials other than wood.  In reaching this conclusion, the

22   Federal Circuit rejected the plaintiff's argument that the broader definition should be adopted

23   because there had been no disclaimer of claim scope during the prosecution of the patent.  *Id*.  The

24   Court noted that the parties agreed that the ordinary and customary meaning of "board" was an item

25   made of wood.  *Id*.  Further, it was undisputed that the written description and prosecution history

26   consistently used "board" to refer to an item made of wood.  *Id*.  The court reasoned:

27         What *Phillips* now counsels is that in the absence of something in the written description
           and/or prosecution history to provide explicit or implicit notice to the public – i.e., those of
28         ordinary skill in the art – that the inventor intended a disputed term to cover more than the

United States District Court

For the Northern District of California

ordinary and customary meaning revealed by the context of the intrinsic record, it is improper to read the term to encompass a broader definition simply because it may be found in a dictionary, treatise, or other extrinsic source.

*Id.*

Similarly, in *AquaTex Indus., Inc. v. Techniche Solutions*, the Federal Circuit held that the term "fiberfill" referred only to synthetic materials and did not encompass natural materials because the patentee consistently used the term in this way in the specification. 419 F.3d 1374, 1380 (Fed. Cir. 2005). The court reached this conclusion even though the specification stated that the composition of the fiberfill was not known to be critical, noting that although there was no disavowal of fiberfill that used natural material, the description consistently used the term with reference to synthetic material, and extrinsic dictionary definitions also supported this construction. *Id.* On the other hand, in *Phillips*, the Federal Circuit held that

the term 'baffle' did not require any specific angle – even in view of the written description's limited disclosure of baffles oriented at right angles to the walls – because the ordinary meaning of the term 'baffle,' as reflected in a dictionary definition to which the parties stipulated and as supported by the overall context of the written description, was simply 'objects that check, impede, or obstruct the flow of something.'

*Nystrom*, 424 F.3d at 1145 (quoting *Phillips*, 415 F.3d at 1324).

"A word or phrase used consistently throughout a claim should be interpreted consistently." *Phonometrics, Inc. v. Northern Telecom Inc.*, 133 F.3d 1459, 1465 (Fed. Cir. 1998). On the other hand, where a claim term is used "in two contexts with a subtle but significant difference" the term "should not necessarily be interpreted to have the same meaning in both phrases." *Epcon Gas Systems, Inc. v. Bauer Compressors, Inc.*, 279 F.3d 1022, 1031 (Fed. Cir. 2002). Further, the modifiers "first" and "second" before a claim term is a "common patent-law convention to distinguish between repeated instances of an element or limitation." *3M Innovative Properties Co. v. Avery Dennison Corp.*, 350 F.3d 1365, 1371 (Fed. Cir. 2003) (holding that "first pattern" and "second pattern" is equivalent to "Pattern A" and "Pattern B"); *see also Swapalease, Inc. v. Sublease Exchange.com, Inc.*, 2009 WL 204408, *11 (S.D. Ohio, Jan. 27, 2009) (holding that "first webpage" and "second webpage" are specific webpages and that "first webpage" is different from "second webpage.").

**B.     Indefiniteness Standards**

The requirement that claims be sufficiently "definite" is set forth in 35 U.S.C. § 112, ¶ 2, which provides that, "[t]he specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." "The definiteness inquiry focuses on whether those skilled in the art would understand the scope of the claim when the claim is read in light of the rest of the specification." *Union Pacific Resources Co. v. Chesapeake Energy Corp.*, 236 F.3d 684, 692 (Fed. Cir. 2001).  In order to "accord respect to the statutory presumption of patent validity," a claim should be found indefinite "only if reasonable efforts at claim construction prove futile." *Exxon Research and Engineering Co. v. United States*, 265 F.3d 1371, 1375 (Fed. Cir. 2001).  Thus, a claim is not indefinite simply because its meaning is not ascertainable from the face of the claims.  *Amgen, Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1342 (Fed. Cir. 2003).   Further, a claim is not indefinite simply because it covers "some embodiments that may be inoperable." *Exxon Research and Engineering Co.,* 265 F.3d at 1382.  A claim is indefinite, however, if it is "insolubly ambiguous, and no narrowing construction can properly be adopted." *Amgen*, 314 F.3d at 1342 (citations omitted).

35 U.S.C. § 112, ¶ 2 requires that so-called "means-plus function" elements, which are limited by statute to the "corresponding structure, material, or acts described in the specification and equivalents thereof" permit one of ordinary skill in the art to "know and understand what structure corresponds to the means limitation." *Finisar Corp. v. The DirecTV Group, Inc.*, 523 F.3d 1323, 1340 (Fed. Cir. 2008) (citation omitted).   In order to construe a means-plus-function term (also known as a 112 ¶ 6 limitation), the Court must first identify the claimed function, and next, "determine what structure, if any, disclosed in the specification corresponds to the claimed function." *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 296 F.3d 1106, 1113 (Fed. Cir. 2002). There is an additional requirement for 112 ¶ 6 limitations, such as in the present case, which are implemented on a computer.  In such cases, the patent "must disclose, at least to the satisfaction of one of ordinary skill in the art . . .an algorithm" for performing the recited function. *Finisar Corp.* 523 F.3d at 1340.

United States District Court

For the Northern District of California

## IV.    DISPUTED CLAIM TERMS

The parties have submitted ten claim terms for construction, consistent with Patent Local Rule 4-3 and the Court's Amended Case Management and Pretrial Order. The Court addresses these claim terms below.

### 1.    "to add function to a Web page"

| Claim Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| to add function to a Web page (Ex. 1, claims 19, 20) | "to add tailored content to a Web page" | "to apply to a web page a software device that displays a graphical representation of a real world device that is capable of performing or administering a service or activity" |

### A.    Arguments

Claims 19-20 of the '691 Patent and Claims 1-3, 9, 14, 20 and 25 of the '636 Patent refer to "adding function to a web page."[2] Augme uses the terms "added function" and "tailored content" interchangeably, asserting that the patent specification describes the "added function" as content in the form of "streaming media or other media services." Ex. 1 at 5:30-39. The patent specification states that streaming media is "defined broadly as audio and video being delivered to a Web site visitor in packets over the Internet" (*id.* at 1:44-45), and provides that "[s]ome examples of streaming media include banners, informational feeds using a 'marquee,' audio based commercials, and so forth." *Id.* at 1:49-51. Essentially, Augme argues that the term "function" must be judged from the perspective of the end user: if one adds content to a web page then that content increases the functionality of the web page for the end user.

Yahoo! offers an alternative construction that appears to be taken largely from the description in the specification of "function" as a "media appliance metaphor or software device that is a "graphical representation of something that looks and behaves like a [real-world] media

---

[2]The Court assumes, without deciding, that this term, which appears in the preamble of these claims, is a limitation.

**United States District Court**
For the Northern District of California

1   appliance [such as a radio]." Yahoo! Resp. Br. at 3-4 (citing Ex. A, '691 patent at 5:40-46).  Yahoo!

2   argues that the patent specification offers no examples of functions added to a web page *other than*

3   via a metaphor (*id*. at 4) and that these disclosures in the patent specification are not mere examples

4   of a preferred embodiment because the specification refers to the metaphor as the invention itself.

5   *Id.* (citing *Nystrom v. Trex Co.*, 424 F.3d 1136, 1143-46 (Fed. Cir. 2005).  Yahoo! asserts further

6   that Augme's own timeline of the alleged conception and reduction to practice "confirms that the

7   purported invention was a 'metaphor.'" Yahoo! Resp. Br. at 5 (citing Ex. C at 5 where invention is

8   referred to as "metaphor").

9        Yahoo! also argues that Augme's "overbroad" definition has been rejected previously by

10  Judge McMahon in the Southern District of New York in the *Tacoda* case.  There, Modavox

11  proposed as similar construction to the one now proposed by Augme.  In the court's initial claim

12  construction order, Judge McMahon found that Modavox's proposed construction was too broad – it

13  would encompass any kind of information that can be found on the web.  Further, the court was not

14  convinced that the further restriction of "tailoring" had any place in the construction of the term.

15  The court in *Tacoda* explained that: "to add function to a webpage does not seem to have anything to

16  do with targeting or tailoring" and that "to shoehorn [this] unrelated concept" into the definition

17  would be improper.  *Tacoda*, 607 F. Supp. 2d  at 534.[3]

18       Yahoo! argues further that Augme improperly equates "function" with "content."  Yahoo!'s

19  Resp. Br. at 6.  By way of example, Yahoo! points out that "function" is the media appliance playing

20  the music, not the music itself.  Yahoo! argues that Augme's assertion to the contrary – that the

21  specification equates content such as "[c]ountry music" with "function" –  is simply incorrect.  *Id.*

22       Augme challenges Yahoo!'s proposed construction on two grounds.  First, Augme asserts

23  that the intrinsic evidence supports its construction that "function" is not limited to "metaphors."

24  Augme points out that the terms "metaphor" and "function" are used independently throughout the

25  _____

26       [3]Since the date of the *Markman* hearing in the present case, the district court in the *Tacoda* case
     has issued a "Supplemental Claim Construction" Order.  *See Modavox, Inc. v. Tacoda, Inc.*, 07- Civ.
27   7088 (CM) (GWG) (September 6, 2011).  There, Judge McMahon construed the term "function" to
     mean "content."  Further, the court ruled that "adding function to a web page" means downloading to
28   a web page content tailored to user parameters."

United States District Court

For the Northern District of California

1   claims.  For example, Claim 1 of the '691 patent claims a "method of operating a computer network

2   to add function to a Web page" and includes a limitation that a second code module contains a

3   service response.  '691 Patent at 14:47-48; 15:1-4.  Claim 14, which is dependent on claim 1,

4   provides that the "service response is a metaphor." *Id.* 16:14-15.  Augme argues that it is clear that

5   the patentees did not use the terms "metaphor" and "function" synonymously in the claims.  Augme

6   Reply at 3.

7        Finally, Augme argues in its brief that Judge McMahon has not yet issued a *Markman*

8   opinion for the term "function" in the *Tacoda* litigation, and thus has not rejected its proposed

9   construction of the term, and notes that Judge McMahon expressed reservations about Tacoda's

10  similarly narrow definition of the term "function" to limit to "streaming media or other media

11  services." *Id.* at 533-34.

12                **B.     Analysis**

13       The Court concludes the patents' use of the term "function" is very broad.  The examples of

14  the materials to be added to a web page described in the specifications include an extremely broad

15  array of content, including databases, prices, advertising, audio, video, banners, informational feeds

16  and commercials.  Augme Br. Exh 1 at 1:37-58.  However, the Court does not share Judge

17  McMahon's legitimate concern that  Plaintiff's definition "literally incorporates all the information

18  ("content") in the world." *Tacoda.* 607 F. Supp. 2d at 532-533.  To the contrary, while the language

19  of the claims and the specification regarding the functions that may be added is broad, the invention

20  claimed is actually the system and method of obtaining this broad content.  In any event, the Court

21  declines to narrow the term chosen by the inventors.

22       However, the inventor did not use the word "content" and the examples in the specification

23  all envision some functionality more than just content.  Each envision content that is not static, but

24  rather involves some service or activity.  Moreover, the Court agrees with the *Tacoda* court's initial

25  assessment (as stated in the first claim construction order) that Augme's definition imports an

26  unrelated concept – that of "tailoring" into the definition of the word function, which is not

27  supported by the patent. *See id.* at 534 (". . . the phrase 'to add function to a webpage' does not

28  seem to have anything to do with targeting or tailoring.").

10

United States District Court

For the Northern District of California

The Court is also unpersuaded by Yahoo!'s proposed construction and concludes that its definition is too narrow. The terms "metaphor" and "function" are not synonymous. As Judge McMahon explained in connection with Tacoda's proposed definition of this term[4], "although the present invention is described in connection with a media appliance metaphor for providing streaming audio, this is not intended to be limiting." *Id.* at 533 (citing '691 Patent, 14:39–48).

Construing "function" to be limited to "media appliance metaphors" as Yahoo! proposes would improperly import a claim limitation from the preferred embodiment. At first blush, Yahoo!'s argument in support of its definition is appealing. Yahoo! argues that Augme relies on an incomplete passage in support of its argument that the patent contains non-limiting language specifically pertaining to media appliance metaphors. Augme cites the following passage: "Although the present invention is described in connection with a media appliance metaphor for providing streaming audio, this is not intended to be limiting." Augme Br. at 7 (citing Ex. 1, 14:41-43). Yahoo! points out that Augme omits the next sentence, which provides: "For example, *the metaphor* may providing [sic] streaming video and other multimedia communication formats." *Id.* (emphasis added). Thus, even in the non-limiting disclaimer setting forth the "invention's outer bounds" the term "the metaphor" is used almost synonymously with "function" in the cited passage (the portion omitted by Augme). However, elsewhere in the patent there is a disclaimer that is even more explicit in terms of clarifying that the invention is *not* limited to a media appliance metaphor:

> Although the present invention is described in connection with the presentation of media appliance metaphor 111 as applied to Web page 34, it need not be limited to such a media appliance metaphor. Rather, first code module 36 (FIG. 2) can be embedded in a Web page to be executed by a visiting processor platform in order to execute other code modules *not associated with media appliance metaphors.*

Ex 1, 5:63-6:1-3 (emphasis added). The patent is clear that the invention need not be limited to "media appliance metaphors." The Court thus rejects Yahoo!'s argument that "function" may be defined as "media appliance metaphor."

---

[4] The defendant in *Tacoda* defined "function" as "streaming media or other media services" and defined "to add function to a web page" as "to add streaming media or other media services tailored (or customized) to be compatible with a Web page." *Tacoda*, 607 F. Supp. 2d at 532. After the hearing, the defendant "somewhat modified" its proposed constructions of these terms. *Id.* at 533. Defendant later proposed a definition of "function" that would limit it to "streaming media or other media services." *Id.*

Accordingly, the Court construes "to add function to a web page" as "to add software to a web page that is capable of performing or administering a service or activity."

### 2. "embedded in said web page" and "embedded therein"

| Claim Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| Code module. . . **embedded in said Web page**<br><br>Code Module . . . **embedded therein**<br><br>(Ex. 1, claims 19, 20, 21, 25)<br><br>(Ex. 2, claims 1, 2, 3, 9, 14, 20, 25 | "inserted in a Web page" | "written into the html code of the web page when the web page developer designs the web page" |

### A. Arguments

Augme argues that the term "embedded" refers to a code module that is inserted in the web page, whether it is contained directly (written into the HTML code) within the web page, or linked to the web page code.

Yaooo! argues, on the other hand, that it is clear from the specification that an "embedded" code module is one that is pasted into the web page HTML before it is downloaded, and not a code module that is linked to the web page HTML. The specification describes "the present invention" as "a simple [first] code module embedded in the HTML of the Web page." Yahoo!'s Responsive Brief ("Resp. Br."). at 8 (citing Exhibit A, '691 Patent at 14:18-22). The first code module is "readily copied and pasted into a Web page during Web page development activities." *Id.* at 14:27-28. Yahoo! cites to several other passages in the specification that support its proposed definition of "embedded:"

1. "First code module 36 is generated in HTML and embedded in the HTML of Web page 34 (FIG. 1) when a Web page developer designs Web page 34." Ex. A at 4:63-65.

2. "That is, first code module 36 may be distributed via Internet 28, and copied and pasted into a Web page during Web page development." *Id.* at 4:67-5:2.

United States District Court
For the Northern District of California

1   Yahoo! also argues that its construction is consistent with the distinction between "first" and

2   "second" code modules.  Yahoo!'s Resp. Br. at 9.  The word "embedded" is used to describe only

3   the first code module.  *Id.*  Yet the specification does not disclose a first code module that is external

4   but linked to the web page code.  In contrast, the patents depict only the second code module as

5   being external but linked to the web page code.  *Id.*  (citing Ex. A at Fig. 3 Line 1).  The patents also

6   describe the web surfer's computer separately retrieving the second code module, and not the first,

7   after the web page is downloaded.  *Id.* at Fig. 2 Line 1; 5:7-20, 6:16-20).  Therefore, Yahoo! argues

8   that given this distinction, "embedding" cannot include external linking, otherwise, the modifier

9   "embedded in said Web page" would be rendered meaningless.  *Id.* (*citing Unique Concepts, Inc. v.*

10  *Brown*, 939 F.2d 1558, 1562 (Fed. Cir. 1991) ("All the limitations of a claim must be considered

11  meaningful").

12      **B.      Analysis**

13      The term "embedded" is a commonly understood term, and the Court concludes that the

14  definition offered by Yahoo! is more persuasive than the definition proposed by Augme.  As noted

15  by Judge McMahon in the co-pending litigation against *Tacoda,* the term "embedded code" means

16  code that has already been inserted into the architecture of the web page.  *Tacoda*, 607 F. Supp. 2d at

17  534.  Yahoo's! definition, to this extent, conforms to the ordinary meaning of the word "embedded."

18      Judge McMahon rejected Augme's proposed definition, concluding that Tacoda's definition

19  (almost identical to the one proposed by Yahoo! here – a computer-readable program that is

20  contained within the HTML code of a web page) conformed to the ordinary meaning of "embedded"

21  and that it "ma[d]e sense in the immediate context of the claims, and "conform[ed] to the

22  specification."  *Id.* at 537.  As the court explained, reading the term "embedded" as Augme suggests

23  would render the word "embedded" surplusage because under Augme's construction both the first

24  and second code modules would be "embedded."  *See Tacoda*, 607 F. Supp. 2d at 535 (Augme's

25  construction would "read . . . 'embedded' out of the patent.").  This Court agrees.  As Yahoo! points

26  out, given that the second code module is not "embedded," a code module that is retrieved via

27  external linking also cannot be "embedded."[5]

28

---

[5]Augme's use of  the *Landsman* reference does not change the Court's conclusion.  There, the "advertising tag" referred to during prosecution was an HTML "script" tag and surrounding text. Yahoo Resp. Br. at 10 (citing Gilgoil Dec., Ex. M at 9).  This "script" tag was "embedded," *i.e.*, contained

United States District Court

For the Northern District of California

1    Augme disputes that the word "embedded" is used only to describe the first code module.

2   Augme Reply at 6.  Augme quotes the specification where it states "[t]he present invention is able to

3   tailor the added function based on information *about the Web page in which it is embedded.*"  Ex. 1

4   at 14:30-32 (emphasis added).  Because, according to Augme, the second code module is the vehicle

5   by which the added function is tailored and added to the web page, this passage states that the added

6   function (and thus the second code module) is also embedded in the web page.  Augme Reply at 6.

7   This argument misreads the specification.  The quoted sentence does not state that the second code

8   module is embedded in the web page – rather, it is a general description of the operation of the

9   invention in which the first code module is embedded.  Looking at the claims themselves, the word

10  "embedded" is used to describe *only* the first code module, and the specification does not disclose a

11  first code module that is externally liked.  In contrast, the patents depict only the second code

12  module as being externally linked.  *See* Augme Br., Ex. 1 at Fig. 3 Line 1.  Given this distinction,

13  the Court is convinced that "embedding" does not include "external linking."  The Court finds that

14  "embedded" is a requirement of the claims, thus a construction that requires "embedded" to be

15  written into the HTML code of the web page before it is downloaded, will not result in reading a

16  limitation into the claims.[6]

17    The Court agrees with Yahoo! that Augme's proposed definition conflicts with the

18  specification.  Augme's argument is essentially that there are many different ways of inserting code

19  into a web page.  Augme cites no evidence from the patent specification that supports its argument

20  that the term "embedded" encompasses external linking.  *See Tacoda*, 607 F. Supp. 2d at 535.

21    The Court construes the term "embedded" as "written into the html code of the web page."

22  //

23  //

24

25

26  within the webpage HTML.  The "script" tag then caused the browser to download an externally linked
    JavaScript file ("loadad.js").  *Id*. at 9.  It is clear that in this reference "embedded" does not refer to the
    externally linked js file to be downloaded.

27

28    [6]However, the Court finds no support for the limitation, proposed by Yahoo!, that the
    "embedding" must occur when the web page designer designs the web page.  There is no limitation as
    to time in the claims – and the writing of or pasting of the HTML code of the first code module might
    occur after the web page is first designed. To the extent that Yahoo! intends that its construction
    encompass each time code is written into the web page, it is already included in the Court's
    interpretation.

**United States District Court**
For the Northern District of California

3. **"service response"**

| Claim Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| service response | "a response indicating a denial, customized or default service to be rendered (displayed) on a Web page." | "a response correlated with the URL of the downloaded web page that indicates whether the downloaded web page is permitted to have access to a requested function, and if yes, how the function should be presented on the web page." |

A. **Arguments**

Augme's proposed construction describes the "service response" as one of three possible responses: 1) "a denial of service," 2) a customized service, or 3) a predetermined default response. Augme Reply at 7. In the co-pending *Tacoda* litigation, Judge McMahon prefaced her discussion of the term "service response" with a brief background of this phrase, in order to "place it in context." There, the court explained:

> The first thing that happens after the first code module issues the first command to retrieve the second code module is that the a [sic] second code module "having a service response" is "assembled" in response to "said issuing operation." The first code module then issues a second command, which initiates execution of the second code module at the end user's computer (the processor platform) in response to the request. . . . So the service response is something that is assembled (built/programmed) into the second code module.

607 F. Supp. 2d at 538-539.

The main difference between the parties' proposed constructions of the term "service response" is that Yahoo!'s definition requires the service response to be correlated with the URL of the downloaded web page, while Augme's does not.

Augme argues that Yahoo!'s proposed definition reads limitations into the claim by proposing that a service response is "a response correlated with the URL of the downloaded webpage. . ." thereby ignoring the claim language and the differences between claims. Augme's Br. at 12. For example, claim 23 of the '636 patent requires "storing . . . said service response in association with a Web address of said web page." Augme's Br., Ex. 2, 18:2-3. Yet, claims 1, 14, and 20 of the '636 patent do not have this limitation. Rather, claims 1 and 14 only require "having a service response" (*id* at 14:63; 16:12) and claim 20 requires "having a service response" that is "formed in response to said information." *Id.* at 17:21-22. Similarly, claim 23, which depends from

15

United States District Court

For the Northern District of California

1   claim 20, adds a further limitation that the "service response [is] in association with a Web address

2   of said Web page." *Id.* at 18:2-3. Thus, Augme argues, Yahoo!'s proposed definition would render

3   this further limitation of dependent claim 23 extraneous. Augme's Br. at 12. By the same token,

4   claims 1 and 19 of the '691 patent require "a service response related to said Web page" but do not

5   require it to be associated with a URL or a Web address. Ex. 1. Rather, dependent claim 6 adds the

6   limitation that the service response be stored "in association with said Web address." *Id.* Augme

7   argues that Yahoo!'s construction would render the additional limitation in dependent claim 6

8   superfluous.

9       Finally, Yahoo! responds that its construction does not violate principles of claim

10  differentiation because each of the dependent claims cited by Augme add a limitation not stated in

11  the parent claim. Specifically, '691 claim 6 and '636 Claim 23 add the step of storing a service

12  response, while '691 claim 21 adds the requirement of a "database." Because Yahoo!'s construction

13  specifies neither a "storing" step nor a "database," Yahoo! argues, its construction of the term

14  "service response" as being correlated with the downloaded URL does not render those claims

15  redundant. Yahoo!'s Resp. Br. at 12 (*citing Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d

16  1316, 1325 (Fed. Cir. 2001) (claim differentiation inapplicable where dependent claim "embrace[d]

17  additional limitations not encompassed" by patent).

18      Yahoo! also argues that the specification "unambiguously" states that the services response is

19  correlated with the URL of the downloaded web page in that the service response is "store[d] . . .in

20  association with the Web address." Ex. A at 8:53-57; 9:14-17. Further, figures 6 and 7 depict this

21  "association."

22      Yahoo! argues finally that it is Augme's construction that violates principles of claim

23  differentiation in that its proposed definition, which limits the "service response" to one of three

24  types – denial, customized or default – is the precise limitation of service set forth in claims 8 and 24

25  of the '636 patent.

26          **B.      Analysis**

27      The Court is not convinced that either definition proposed by the parties is entirely correct.

28  The Court must resolve two issues in order to construe the term "service response." First, it must

determine whether to accept that the term "service response" is limited to the three possible

"responses" set forth in Augme's proposed definition, or whether such a definition violates principles of claim differentiation.  And second, the Court must resolve whether Yahoo!'s proposed limitation requiring the service response to be correlated with the downloaded URL is correct or whether it violates claim differentiation.

The Court finds the discussion in the co-pending *Tacoda* litigation to be instructive on the first point.  There, the court analyzed the patent specification and concluded that to limit the definition of "service response" to one of three possible answers, replies or "responses" would violate principles claim differentiation and render certain claims superfluous.  *Tacoda*, 607 F. Supp. 2d at 539.  The court explained that to accept the plaintiff's (then known as "Modavox") definition of "service response" specified  in claim 1 of the '636 patent as limited to one of three possible responses – deny, customize or default, as set forth in dependent claim 8, would violate claim differentiation.  *Id.*  This Court agrees.  Under the doctrine of claim differentiation, one must assume that dependent claim 8 adds some new requirement.  The only new requirement set forth in claim 8 is that the response be one of three responses claimed in claim 8.

The Court also concludes that there is no requirement in the definition of "service response" that it be correlated with the URL of the downloaded web page.  It is clear from the patent specification that only after the service response is formed by the processor is it stored in a database and associated with a Web address.  The Court is convinced that the service response is formed *before* it is stored in a database, and that its association with a web address is a result of how the service response is stored and not an attribute of the service response itself.  Augme's Resp. Br. at 7. For example, the citation on which Yahoo! relies is directed to the storing step, not steps in which the service response is formed.  *See* Opp Br. at 11 (citing Ex. 1 at 8:53-57 ("Following task 170, registration subprocess 132 proceeds to task 146 for generation of an entry in Web address database 68 (FIG. 7) to store the service response in association with the Web address."); Fig. 6: step 146 ('Generate entry in database to store service response in association with web address").  Figures 6 and 7 do not add any support to Yahoo! contention: they do not indicate that the service response itself must, by definition, be correlated with a URL.

17

The Court construes the term "service response" as "a response that indicates whether the downloaded web page is permitted to have access to a requested function, and if yes, how the function should be presented on the web page."

**4.     a "code module"**

| Claim Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| a "code module" | plain and ordinary meaning requiring no further construction<br><br>OR<br><br>"a collection of computer program instructions, which can include data or data structures, for performing computing tasks." | "a unit of computer program instructions for performing specific computing tasks." |

The Court is asked to construe the term "code module."[7]  The primary issue in dispute is whether the "code module" should be construed as a "collection" of computer instructions or whether it means "a unit" of computer program instructions.

**A.     Arguments**

Augme asserts that support for its definition of the term "code module" can be found in the specification, which indicates that a web address is data that is included in a computer program instruction. First, they assert that the code module must be defined functionally, not by whether or not the code is all in one location. Augme notes that Yahoo!'s own expert, Dr. Nutt, agrees with Augme's definition in that he testified that a "unit" could contain "subassemblies."  Augme Br. at 14.  Augme also argues that "the file history makes clear that the *Landsman* patent described above in which the code module is separated across multiple files is 'one functional code module.'" *Id.* The specification also discloses computer program instructions that "communicate browser information 56 (FIG. 1) and platform information 58 (FIG. 1), through the execution of first

---

[7]The Court notes that in the *Tacoda* litigation, Augme and Tacoda agreed at the *Markman* hearing that the term "code module" is "a bundle of code that can read – or, more simply, a computer program."  *Tacoda*, 523 F. Supp. 2d at 534.  The parties' disagreement centered around the term "embedded" not on the definition of the term "code module."

United States District Court
For the Northern District of California

1  command line 92, to server system 26." Ex. 1 at 6:24-28. Thus, Augme argues, one of ordinary

2  skill in the art would understand that computer program instructions can include data or data

3  structures.

4       Yahoo! responds that "module" means a discrete "unit." Yahoo! argues that under Augme's

5  definition, a "code module" could consist of separate lines of code scattered throughout many

6  locations in a web page, despite the fact that the specification is clear that the "invention" involves

7  discrete code modules, not "haphazard lines of code." Yahoo! Resp. Br. at 13 (citing Ex. A, '691

8  Patent at 14:18-30) ("the present invention" includes "a code module [that] is easily distributed . . .

9  and is readily copied and pasted into a Web page during Web page development activities.").

10 Yahoo! asserts that its definition of "unit" would easily be understood by a jury to mean something

11 contiguous that can be copied and pasted into a web page with ease. *Id.*

12      Yahoo! asserts that Augme's file history argument is not apt because the patent Examiner

13 identified two code modules in the *Landsman* reference: "the advertising tag" (first code module)

14 and the "AdController" (second code module). Yahoo! Resp. Br. at 14-15 (citing Ex. M at 9).

15 Yahoo! points out that the patentees did not dispute that these two code modules were separate;

16 rather, they argued that the second code module was the "same code module" for all web servers

17 because it was not individually tailored to each one. *Id.* The use of the "same" second code module

18 for all web surfers is what was meant by "one functional code module" *not* that the two *Landsman*

19 code modules are one in the same. *Id.*

20      Finally, Yahoo! argues that its definition is supported by the extrinsic evidence. Specifically,

21 Yahoo! cites to the 2000 *Computer Science and Communications Dictionary*, which defines

22 "module" as "a computer program unit that is discrete and identifiable and therefore can be treated

23 as a unit." Yahoo's Resp. Br. at 13 (citing Ex. G at 1039). Yahoo! argues that Augme's own

24 extrinsic evidence supports Yahoo!'s proposed definition as well. Specifically, Augme has cited the

25 *IBM Dictionary of Computing*, which defines "module" as "[a] program unit that is discrete and

26 identifiable." Docket No. 118, App'x A at 5.

27                    **B.**    **Analysis**

28      The Court construes the term "code module" as "computer program instructions for

performing specific computing tasks."

19

First, nothing in the language of the claims points toward the conclusion that the term "code module" should be construed as a "collection of code."

Nor does the Court find support in the specification that the term should be limited to "a discrete unit" as advanced by Yahoo!.  This proposed construction is too narrow.  While the Court agrees with Yahoo! that the code should be "easily copied and pasted into a Web page" as identified in the specification, the Court concludes that Yahoo!'s proposed definition, which essentially imports a new requirement – that the lines of code be contiguous – is not supported by the patent.

Rather, the Court is convinced that a definition similar to that advanced by both parties in the *Tacoda*[8] litigation, and adopted by the court there, should be used here.  Therefore, the Court construes "code module" as follows: "computer program instructions for performing specific computing tasks."

**5. Assembly "in response to said first and second information," "responsive to said first and second information," and "in response to said information"**

| Claim Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| Assembly "in response to said first and second information," "responsive to said first and second information," and "in response to said information"<br><br>(Ex. 1, claims 19, 20, 25 )<br><br>(Ex. 2, claim 14) | plain and ordinary meaning<br><br>OR<br><br>"such that the second code module is assembled using said information to target the second code module to said Web page." | "In response to said first and second information" or "responsive to said first and said information means:<br><br>"Such that the second code module is compatible with the web browser and client machine combination of the web page visitor."<br><br>"in response to said information" means:<br><br>"such that the second code module is compatible with the web browser or computer processor of the web page visitor." |

Several of the claims in the patents require assembling the second code module in response to information about the web surfer's browser and computer.  The dispute centers around whether

**United States District Court**
For the Northern District of California

---

[8]In *Tacoda*, the court stated: "The parties agree that a 'code module' is a bundle of code that a computer can read – or, more simply, a computer program."  *Tacoda*, 607 F. Supp. 2d at 534.

United States District Court

For the Northern District of California

1  that assembly makes the second code module compatible with the web surfer's browser and

2  computer (Yahoo!'s proposed construction) or whether it targets the second code module to the web

3  page (Augme's construction).  The Court concludes that this claim term does not include either of

4  these limitations.

5                    **A.      Arguments**

6         Augme argues that "the claim language is clear and no further construction is required."  It

7  also proposes the following alternative construction:  "In response to said information" means "such

8  that the second code module is assembled using said information to target the second code module to

9  said Web page."  Augme offers little support for its construction, which includes the term "target."

10  Rather, Augme argues that Yahoo!'s construction is improper because it imports an additional

11  limitation into the claim -- the concept of compatibility – as a further requirement of the claim.

12  Augme Br. At 15.  Augme also asserts that Yahoo!'s proposed construction introduces a requirement

13  for a "web page visitor" though there is nothing in the claim language to support such a requirement.

14  Augme's Reply at 11.

15          In support of its own construction, Augme points out that the patent specification describes

16  the assembly of the second code module in response to certain information including a service

17  response, which may be customized.  Augme Br. at 16 (citing Ex. 1, 8:45-48).  The patent further

18  provides that such customization may be determined "using said information to target the second

19  code module to said Web page." Augme Br. at 16 (citing 14:30-33).

20          Yahoo!, on the other hand, argues that the specification requires that the second code module

21  be assembled for compatibility.  *See* Ex. A at 11:67-12:9.  That portion reads:

22          [S]econd code module 90 is assembled in response to browser information 56 and platform
        information 58.  In other words, second code module 90 is assembled to include the service
23          response and to work with any combination of browser/platform systems . . . . In addition,
        since second code module 90 is assembled in response to browser information 56, second
24          code module 90 *is compatible with* Web browser 52 (FIG. 1) used by second processor
        platform . . .

25

26  Ex. A at 11:67-12:9 (emphasis added).

27          Yahoo! argues further that Augme's construction, of "targeting" the second code module to

28  the web page would contradict the claim language because the claim (*e.g.*, '691 patent, claim 25)

requires assembly "in response to said first [information related to the Web browser] and second

21

**United States District Court**
For the Northern District of California

1    information [related to said processor platform (*i.e.*, computer)]."  It does not refer to assembly "in

2    response to said Web page."  Yahoo!'s Resp. Br. at 16.

3         Yahoo! also argues that the prosecution history supports its construction.  The patentees

4    distinguished the *Landsman* and *Davis* references as not teaching assembling the second code

5    module based upon information about the web surfer's browser or computer.  Yahoo!'s Resp. Br. at

6    16 (citing Ex. M at 10-11; Ex. N at 16-17, 22-23).  According to the patentees: "If the [web surfer's

7    computing] environment is not . . .compatible [with the second code module], then the code may be

8    unused and may cause the possible 'crash' of the particular computer system's Web browser."  Ex.

9    M at 10.  The invention, therefore, avoided this problem by assembling the second code module to

10   be "compatible" with the web surfer's "processor platform" and "Web browser environment":

11       [T]he second code module is responsive to first information characterizing the Web browser
         and second information characterizing the processor platform. Accordingly, Applicants'
12       invention . . is an improvement over techniques such as that taught by *Landesman* because
         Applicants' invention enables the appropriate controls or runtime code to be loaded in a
13       particular processor platform/Web browser environment.  As such, the content can be
         tailored to the type of user (processor platform and Web browser) . . . . [T]he second code
14       module . . .may be any language that executes within the compatibility of the processor
         platform/Web browser environment.
15

16   Ex. M at 11.  Yahoo! thus argues that the patentees were clear that the second code module was

17   assembled in response to the browser and platform information for compatibility reasons, and they

18   criticized the prior art for lacking this technique.  Yahoo!'s Resp. Br. at 16 (citing *Inpro*, 450 F.3d at

19   1356 (interpreting claims to exclude disparaged prior art technique)).

20        Finally, Yahoo! argues that Augme's construction makes no sense because, according to the

21   claim language, the second code module is assembled in response to "said information" *i.e.*,

22   information about the web surfer's *browser and computer,* and says nothing about the *web page*.

23   Yahoo!'s Resp. Br. at 17.  Yahoo! points out that Augme cites to unrelated portions of the

24   specification in support of its construction, first that the specification refers to "customizing" the

25   service response to "include references to commercials targeted to Web page 34, custom

26   configuration data, custom Web page metaphor preferences, Web page owner preferences, and so

27   forth."  Augme Br. at 16 (citing '691 patent at 8:45-48).  Yahoo! further cites to the statement in the

28   specification that "[t]he present invention is able to tailor the added function based on information

     abut the Web page in which it is embedded and based on visitor specified preferences."  *Id.* (citing

**United States District Court**

For the Northern District of California

1  '691 patent at 14:30-33).  Yahoo! argues that neither of these unrelated portions of the specification

2  has anything to do with the claim term at issue here and thus offer no support for Augme's definition

3  and the use of the term "targeting."

**B.      Analysis**

5       The Court is not persuaded that either party's proposed construction is correct.  Both the

6  introduction of the concept of "targeting" (offered by Augme) and "compatibility" (offered by

7  Yahoo!) import additional limitations into the claims.

8       Augme's reliance on two unrelated portions of the specification in support of its introduction

9  of the concept of targeting is improper.  Further, the claim language says nothing about "the web

10 page" and therefore, this aspect of Augme's proposed construction should not be included.

11      By the same token, however, Yahoo!'s introduction of the concept of "compatibility" with

12 the web browser or client machine is inappropriate.  It results in the importation of an additional

13 limitation from one description in the specification that is not included in the claims.  There is

14 nothing in the claims that requires that the second code module always be compatible with the

15 browser or platform of the client machine.  Rather, it is clear that the term simply envisions that the

16 second code module will be assembled, using, *inter alia*, the information on the browser and

17 platform (*i.e.*, the "first" and "second" information).

18      Accordingly, the Court construes the terms as "using said first and second information."

19      **6.      "Initiating execution of said second code module"**

| Claim Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| Initiating execution of said second code module | plain and ordinary meaning<br><br>OR<br><br>causing to begin execution of a code module | the first code module, as distinguished from the browser, instructs the second code module to begin executing. |

**A.      Arguments**

26      Augme argues that the term "initiating execution of said second code module" should have

27 its plain and ordinary meaning and that any juror will readily understand the meaning of the term in

28 the context of the claims.  In the alternative, Augme offers a proposed construction of the term

"causing to begin execution of a second code module."  As with disputed term 5, Augme provides

1    little support for its proposed alternative construction of this term; rather Augme argues that

2    Yahoo!'s proposed definition is improper for it reads in limitations from independent claim 1 in the

3    '636 patent into independent claims 14 and 20.  Claim 1 of the '636 patent requires "said first code

4    module issuing a second command to initiate execution of said second code module."  Augme's Br.

5    at 16 (citing Ex. 2 at 14:63-64).  In contrast, Augme argues, claims 14 and 20 require "initiating

6    execution of said second code module."  These claims do not specify that a first code module

7    initiates the execution of the second code module.  Augme therefore argues that it would be

8    improper to construe this element to require "a first code module" to initiate the execution.

9        Yahoo! responds that this argument is incorrect because it would allow for a different

10   mechanism of executing the second code module – a browser's automatic execution of the second

11   code module – which is not part of the claimed invention and which is much broader than what is

12   claimed.  Rather, the patent only discloses one method of initiating execution of the second code

13   module and that is by "a second command" issued by the first code module.  Yahoo!'s Resp. Br. at

14   18.  Yahoo! cites to the specification, which describes the "present invention" in two forms: first,

15   "the first code module issues a second command to initiate execution of the second code module"

16   (Ex. A at 2:36-45) and in the second form, the first code module "includes means for initiating

17   execution of said second computer readable code module."  (Ex. A at 2:63-65).  Yahoo! argues that

18   "these features of the invention as a whole must be part of the claims."  Yahoo!'s Resp. Br. at 18

19   (citing *C.S. Bard*, 388 F.3d at 863-65).

20       Yahoo! argues that Augme's construction fails for an additional reason – the patentees

21   expressly disavowed the "automatic" technique during patent prosecution.  *Id.*  In particular, the

22   patentees distinguished *Landsman* and *Davis* because they disclose the "'Web browser'" initiat[ing]

23   execution of the second code module' automatically."  *Id.* at 19 (citing Ex. M at 10-11; Ex. N at 14-

24   15).  Whereas, in the claimed invention, the execution of the second code module is initiated by the

25   "first code module issu[ing] a second command."  *Id.* (citing Ex. M at 11; Ex. N at 14).

26       Augme responds that Yahoo!'s reliance on the prosecution history is misplaced because

27   "[t]he discussion on which Yahoo! relies is directed to claims that specifically require that the first

28   code module issues a command to initiate execution of the second code mode."  Augme Reply at 12

(citing Gilfoil Dec. Ex. N at 11-15) ("For the reasons set forth above, Applicants' operation of said

24

United States District Court

For the Northern District of California

1    first code module issuing a second command to initiate execution of said second code module at said

2    processor platform, as recited in claim 1, is neither disclosed nor suggested by the Davis [sic].")

3    Augme argues that "the patentees did not draw that distinction between *Landsman* or *Davis* with

4    respect to claims that did *not* include such a limitation." *Id.* (emphasis added) (citing Gilfoil Dec.,

5    Ex. N at 15-18).  Thus, according to Augme, "the prosecution history supports its position that the

6    claim language properly sets forth the boundaries of the claims; the limitation found in claim 1 of the

7    '636 patent should not be imported into independent claims 14 and 20." *Id.*

8            **B.      Analysis**

9           The Court agrees with Augme that this term does not require that the first code module

10   initiate the execution of the second code module.  The claim differentiation argument is dispositive:

11   Claims 14 and 20 of the '636 patent both contain the term at issue and neither require that the first

12   code module initiate the execution of the second code module.  Claim 1, on the other hand, does add

13   this limitation.

14          The Court is not persuaded by Yahoo!'s citation to the prosecution history.  The patentees

15   distinguished between their execution method as disclosed in the patent, and the automatic browser

16   execution in the prior art, only with respect to claims that included the limitation that the first code

17   module initiate the execution of the second.  They did not disclaim automatic execution with respect

18   to other claims.

19          Accordingly, the Court construes the term "initiating execution of said second code module"

20   as "causing to begin execution of a code module."

21   //

22   //

23   //

24   //

25   //

26   //

27   //

28   //

**United States District Court**
For the Northern District of California

7.    "**means for communicating a Web address of said Web page to a server system via a network connection to initiate a download of a second computer readable code module to said client machine**"

| Claim Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| means for communicating a Web address of said Web page to a server system via a network connection to initiate a download of a second computer readable code module to said client machine<br><br>(Exh. 1, Claims 19, 20) | **Function**: communicating a Web address of said Web page to a server system via a network connection to initiate a download of a second computer readable code module to said client machine.<br><br>**Structure**: a computer programmed with special purpose software modules to execute an algorithm, which includes the steps of: (1) accessing a Web page on the Internet through a first Web address, the Web page having an embedded first computer readable code module; (2) moving a copy of the Web page into temporary memory; (3) initializing a first command to activate a second Web address for contacting a server system; (4) communicating over a network connection, via the first command, the first Web address to the server system; and (5) initiating the download of a second computer-readable code module, and structural equivalents thereof. | **Function:**  communicating a Web address of said Web page to a server system via a network connection to initiate a download of a second computer readable code module to said client machine.<br><br>**Structure:** Indefinite. The '691 Patent lacks any adequate disclosure of corresponding structure for this limitation. Accordingly, the claims including this limitation are invalid for indefiniteness under 35 U.S.C. § 112 ¶ 2. |

As a threshold matter, the Court notes that disputed terms 7-10 are "means-plus-function" terms. 35 U.S.C. § 112, ¶ 2 requires that means-plus-function claims, which are limited by statute to the "corresponding structure, material, or acts described in the specification and equivalents thereof" "permit one of ordinary skill in the art to 'know and understand what structure corresponds to the means limitation.'" *Finisar Corp. v. The DirecTV Group, Inc.*, 523 F.3d 1323, 1340 (Fed. Cir. 2008) (citation omitted).  In order to construe a means-plus-function term the Court must first identify the claimed function, and next "determine what structure, if any, disclosed in the specification corresponds to the claimed function." *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*,

26

1   296 F.3d 1106, 1113 (Fed. Cir. 2002).  The parties agree that there is a further requirement for 112 ¶

2   6 limitations, such as in the present case, which are implemented on a computer.  In such cases, the

3   patent "must disclose, at least to the satisfaction of one of ordinary skill in the art . . .an algorithm"

4   for performing the recited function.  *Finisar Corp.*, 523 F.3d at 1340.  The parties also agree on each

5   of the recited functions as set forth in disputed terms 7-10, which will be addressed separately

6   below.  Where the parties disagree is whether the specification discloses an algorithm for performing

7   each function.

8                          **A.      Arguments**

9          Augme asserts that the patent specification discloses the structure for the algorithm to

10  perform the claimed function of "communicating a Web address of said Web page to a server system

11  via a network connection to initiate a download of a second computer readable code module to said

12  client machine" as follows:

| Step | Patent Specification Citation |
|------|-------------------------------|
| **Steps 1-2:** | With reference back to FIG. 3, Web page display process 110 begins with a task 112. Task 112 causes Web browser 52 to download Web page 34 at second processor platform 24. In other words, Web browser 52 moves a copy of Web page 34, with the embedded first code module 36 into temporary memory 54 (FIG. 1) of second processor platform 24. (Ex. 1 at 6:3-8.) |
| **Step 3:** | When Web page 34 is downloaded at second processor platform 24 in task 112, a task 114 is performed. Task 114 causes Web browser 52 to automatically execute first code module 36 embedded in Web page 34, a copy of which is now stored in temporary memory 54. (*Id.* at 6:9-13.) |
| **Step 4:** | Task 118 causes second processor platform 24 to communicate Web address 38 to server system 26 through the execution of first command line 92…. (*Id.* at 6:20-23.) |
| **Step 5:** | That is, as server system 26 communicates second code module 90 to second processor platform 24, task 244 causes platform 24 to receive, via network connection 96 (FIG. 1), second code module 90. (*Id.* at 12:31-35.) |

24  Augme's Br. at 18.  Citing its expert, Dr. Keller, Augme argues that "based [on the above]

25  disclosure, one of ordinary skill in the art would readily discern the disclosed algorithm for

26  performing the claimed function of 'communicating a Web address of said Web page to a server

27  system via a network connection to initiate a download of a second computer readable code module

28  to said client machine.'"  Augme Br. at 18 (citing Keller Decl. ¶13).

Yahoo! disputes this contention and asserts that the specification fails to disclose *how* a Web address is communicated to a server system. Yahoo! points out that the specification's discussion of this functionality is limited to two sentences: 1) "In addition, first command line 92 communicates Web address 38 to server system 26 via a network connection 96 (FIG. 1) over Internet 28 . . ." and 2) "Task 118 causes second processor platform 24 to communicate Web address 38 to server system 26 through the execution of first command line 92, as discussed previously." Yahoo!'s Resp. Br. at 21 (citing Ex. A at 5:11-13, 6:20-23). Yahoo! argues that these sentences merely re-state the stated function – communicating a web address to server system – and fail to disclose *how* that occurs. Citing *Finisar, supra*, Yahoo! argues that merely restating the recited function is insufficient. *Finisar*, 523 F.3d at 1340 (algorithm that was "nothing more than a restatement of the function" was insufficient"). Yahoo! explains that the correct inquiry is not whether one skilled in the art would know how to program a computer system to perform the function (Augme's Br. at 18), but rather, the proper inquiry is "whether one of skill in the art would understand the specification to disclose a structure, not simply whether that person would be capable of implementing that structure." *Aristocrat Technologies Australia Pty Ltd. v. Int'l. Game Tech.*, 521 F.3d 1328, 1337 (Fed. Cir. 2008).

In its reply brief, apparently realizing that the portions of the specification cited in its opening brief merely repeated the function of "communicating," Augme points to different portions of the specification, which it argues demonstrate how a Web address is communicated to a server system. Augme points to the general descriptions in the specification, which state that the Internet uses HTTP for communication. Augme Reply at 13 (citing Ex. 1 at 4:19-21) ("Web browser 52 uses HyterText Transfer Protocol (HTTP) for communicating over internet 28"). Augme further points to where the specification discloses that a "Web address is a Universal Resource Locator (URL), or a string expression used to locate Web page 34 via network 28." *Id.*, 3:58-60. A "network connection" is shown in Figure 1, which is the Internet in one embodiment. *Id.*, 3:43-44. Further, the network connection is described with reference to Figure 1: "[p]orts 78 are in communication with server structure 72 and Internet 28 and are used by the Transmission Control Protocol/Internet Protocol (TCP/IP) transport protocol for providing communication across interconnected networks, between computers with diverse hardware architectures, and with various operating systems." *Id.*,

United States District Court

For the Northern District of California

1   4:38-43.   Moreover, a server system is disclosed as "includ[ing] a processor (CPU) 62, a memory

2   64, a database structure 66 having a Web address database 68 and a visitor database 70, and a server

3   structure 72 for accommodating streaming media servers 74 and other media servers 76." *Id.*,

4   4:34-38.   Based on this disclosure, Augme argues, the specification describes how a Web address is

5   communicated to a server system over a network via the first command to download a second

6   computer readable code module.  Ex. 1 at 5:7-19.

7                    **B.      Analysis**

8            The specification discloses no structure that corresponds with the stated function, and

9   therefore the claims including this limitation are therefore invalid for indefiniteness under 35 U.S.C.

10  § 112 ¶ 2.   The portions of the specification recited by Augme in its reply brief do not disclose an

11  algorithm for *how* the stated function is performed – that is, how a web address is communicated via

12  a network connection such that one of ordinary skill in the art would understand that the patent

13  discloses a structure for performing this function.   Rather, the patent appears to simply restate the

14  function.  *Finisar* is instructive.   In *Finisar*, the Federal Circuit upheld a district court finding that

15  the structure recited in the patent at issue did not "even meet the minimal disclosure necessary to

16  make the claims definite."  *Finisar*, 523 F.3d at 1341.   There, the patent recited that "software 132

17  (executed by CPU 130) generates a hierarchical set of indices referencing all the data in the

18  information database 112 and embeds those indices in the information database."  *Id.* at 1340.   The

19  Federal Circuit upheld the district court's finding that this "structure" was no more than a

20  restatement of the function as recited by the claim.  *Id.*   A second passage, describing an alternate

21  embodiment wherein a block of packet ID values are assigned to an off-line information provider,

22  which then puts them into a database, similarly provided "no algorithm or description or structure

23  corresponding to the claimed function."  *Id.*

24          The present claims are similar to those in *Finisar*.  Augme points to "first command line 92

25  communicates Web address 38 to server system 26 via a network connection 96 (FIG. 1) over

26  Internet 28" (Ex. 1 5:11-13) and "Task 118 causes second processor platform 24 to communicate

27  Web address 38 to server system 26 through the execution of first command line 92, as discussed

28  previously" (Ex. 1 6:20-23) as evidence of structure.   The Court is unable to discern an algorithm

    from these passages.   The Court concludes that the disputed term is indefinite because it provides

United States District Court
For the Northern District of California

1    "nothing more than a restatement of the function, as recited in the claim."  *Finisar.*523 F.3d at 1340

2    (citation omitted).  As the Federal Circuit explained in *Atmel Corp. v. Information Storage Devices,*

3    *Inc.*, 198 F.3d 1374, 1380 (Fed. Cir. 1999), "consideration of the understanding of one skilled in the

4    art in no way relieves the patentee of adequately disclosing sufficient structure in the specification."

5    It is not sufficient for the patentee to argue that persons of ordinary skill in the art would know what

6    structures to use to accomplish the claimed function.  The court in *Biomedino, LLC v. Waters*

7    *Technologies Corp*., 490 F.3d 946, 953 (Fed. Cir. 2007), explained: "The inquiry is whether one of

8    skill in the art would understand the specification itself to disclose a structure, not simply whether

9    that person would be capable of implementing a structure."  Here, Augme's argument amounts to

10   nothing more than saying 'one of ordinary skill in the art would be able to implement' the structure.

11          The additional features cited by Augme in its reply do not change this conclusion.  Augme

12   asserts that a server system is disclosed as "includ[ing] a processor (CPU) 62, a memory 64, a

13   database structure 66 having a Web address database 68 and a visitor database 70, and a server

14   structure 72 for accommodating streaming media servers 74 and other media servers 76" (*id*., at

15   4:34-38) and argues that these passages, along with general descriptions of HTTP and URLs,

16   constitute the required structure.  The Court disagrees.  As in *Finisar*, the fact that certain basic

17   computer components or software are identified in the patent does not enable one of ordinary skill in

18   the art to understand this collection of components as an algorithm or description of structure.

19   *Finisar* 523 F.3d at 1340.  Although this Court must construe the claims to preserve validity, if

20   possible, *see, e.g., Tate Access Floors, Inc. v. Interface Architectural Resources, Inc.*, 279 F.3d

21   1357, 1367, 61 USPQ2d 1647, 1654 (Fed. Cir. 2002), where the specification fails to disclose

22   structure corresponding to the claimed function, it cannot be done.

23   //

24   //

25   //

26   //

27   //

28

United States District Court

For the Northern District of California

8.   "means for communicating first information characterizing said Web browser to said server system"

| Claim Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| **means for communicating first information characterizing said Web browser to said server system**<br><br>(Ex. 1, Claims 19, 20) | **Function:** communicating first information characterizing said Web browser to said server system.<br><br>**Structure:** a computer programmed with special purpose software modules to execute an algorithm, which includes the steps of: (1) storing in memory a Web browser program and information characterizing the Web browser; (2) accessing a Web page through a first Web address using the Web browser, the Web page having an embedded first code module; (3) initiating a first command in the first code module to activate a second Web address for contacting a server system; and (4) communicating over a network connection to the server system via the first command, the first Web address and the information characterizing the Web browser, and structural equivalents thereof. | **Function:** communicating first information characterizing said Web browser to said server system.<br><br>**Structure:** The '691 Patent lacks any adequate disclosure of corresponding structure for this limitation. Accordingly, the claims including this limitation are invalid for indefiniteness under 35 U.S.C. § 112 ¶ 2. |

A.   **Arguments**

As with disputed term 7, the parties agree on the function.  They disagree on whether there is a corresponding structure.  Augme asserts that the patent specification discloses the structure for the algorithm to perform the claimed function of "communicating first information characterizing said Web browser to said server system" as follows:

//

//

United States District Court

For the Northern District of California

| Step | Patent Specification Citation |
| --- | --- |
| 1 | Memory 42 includes Web browser software 52 and a temporary memory 54. A first portion of memory 42 is designated for browser information (BROWSER INFO.) 56, and a second portion of memory 42 is designated for platform information (PLATFORM INFO.) 58. (Ex. 1 at 4:4-9.) |
| 2 | With reference back to FIG. 3, Web page display process 110 begins with a task 112. Task 112 causes Web browser 52 to download Web page 34 at second processor platform 24.  In other words, Web browser 52 moves a copy of Web page 34, with the embedded first code module 36 into temporary memory 54 (FIG. 1) of second processor platform 24. (*Id.* at 6:3-8.) |
| 3 | When Web page 34 is downloaded at second processor platform 24 in task 112, a task 114 is performed. Task 114 causes Web browser 52 to automatically execute first code module 36 embedded in Web page 34, a copy of which is now stored in temporary memory 54. (*Id.* at 6:9-13.) |
| 4 | Task 118 causes second processor platform 24 to communicate Web address 38 to server system 26 through the execution of first command line 92…. |
| | Next, a task 120 is performed. Like task 118, task 120 causes second processor platform 24 to communicate browser information 56 (FIG. 1) and platform information 58. (FIG. 1), through the execution of first command line 92, to server system 26. (*Id.* at 6:20-28.) |

Citing its expert Dr. Keller, Augme argues that based on this disclosure, one of ordinary skill in the art would readily discern the disclosed algorithm for performing the claimed function of "communicating first information characterizing said Web browser to said server system." Augme Br. at 20 (citing Keller Decl. ¶ 20).   Augme argues that "[a] person of ordinary skill in the art at the time of the invention would have known how to program a computer system to perform each step of the disclosed algorithm."  Augme Br. at 18 (citing Keller Decl. ¶ 19).

Yahoo! responds that this limitation is indefinite for the same reasons discussed above with respect to the "communicating" means of disputed term 7.  Yahoo!'s Resp. Br. at 21-22.  Yahoo! argues that Augme misstates the inquiry – the question is *not* whether one of ordinary skill in the art "would know how to program a computer" to perform the function; rather, the question is whether one of ordinary skill in the art would understand *the specification to disclose a structure*.  Yahoo!'s Resp. Br. at 21 (citing *Aristocrat*, 521 F.3d at 1337) ("Whether the disclosure would enable one of ordinary skill in the art to make and use the invention is not at issue here.  Instead, the pertinent question in this case is whether Aristocrat's patent discloses structure that is used to perform the

32

United States District Court
For the Northern District of California

1    claimed function.").  Yahoo! points out that the specification devotes just one sentence to the recited

2    functionality:

3           Like task 118, task 120 causes second processor platform 24 to communicate browser
            information 56 (FIG. 1) and platform information 58 (FIG. 1), through the execution of first
4           command line 92, to server system 26.

5    Yahoo!'s Resp. Br. at 22 (citing Ex. A at 6:24-28).  Relying upon the declaration of its expert, Dr.

6    Nutt, Yahoo! argues that "this sentence does not disclose an algorithm for communicating browser

7    information to a server, as it does not explain *how* the information is communicated."  *Id.* (citing

8    Nutt Decl. ¶ 8).  Yahoo! argues that this sentence merely restates the function – "communicating

9    [browser information] to said server system – as "[s]econd processor platform . . . communicate[s]

10   browser information . . . to server system."  *Id.* (citing *Finisar*, 523 F.3d at 1340).

11          Augme replies that the specification shows how a Web address is communicated to a server

12   system.  Specifically, Augme makes the same argument as it does with respect to disputed claim

13   term 7 discussed above.  Augme cites to several portions of the specification in support of its

14   argument that the patent sufficiently discloses the algorithm for performing the stated function:

15          "Browser information 56 is information specific to Web browser 52. Browser information 56
            includes, for example, make and version of Web browser 52, what plug-ins are currently
16          present, and so forth." (Ex. 1 at 4:25-28).  The specification discloses how this information is
            communicated to the server system over the network (discussed above). *Id.*, 4:38-43.
17          Specifically, with respect to Figures 1 and 2, the specification discloses "[a] first command
            line (LINE NO. 1 [in Fig 2]) 92 contains an exemplary initialization for a first command 93,
18          *i.e.*, a script, that will activate a Web address 94 for contacting server system 26 (FIG. 1) and
            calls CGI program 84 into execution." *Id.*, 5:7-10.) Then, "[t]ask 190 [in FIG. 5] causes
19          processor 62 [on the server system] (FIG. 1) to receive browser information 56 (FIG. 1) and
            platform information 58 (FIG. 1) from second processor platform 24 (FIG. 1)." *Id.*, 9:41-43.

20

21   Augme Reply at 13-14.  Thus, Augme argues that the specification discloses an algorithm for

22   "communicating first information characterizing said Web browser to said server system."  *Id.*

23                  **B.      Analysis**

24          The Court finds claims containing this term to be indefinite.  Command line 92, identified by

25   Augme, says nothing about communicating the "first information."  Similarly, task 190 merely

26   restates the function of "causing" the receipt of browser information.  While, wherever possible, the

27   Court will construe the claims to preserve validity, *see Cardiac Pacemakers, Inc. v. St. Jude*

28   *Medical, Inc.*, 296 F.3d 1106 (Fed. Cir. 2002) (citing *Tate Access Floors, Inc. v. Interface*

*Architectural Resources, Inc.*, 279 F.3d 1357, 1367, 61 USPQ2d 1647, 1654 (Fed. Cir. 2002), it

cannot do so with respect to these claims.

9. **"means for assembling, at said server system, said second computer readable code module, said second computer readable code module containing a service response related to said Web page, said second computer readable code module being responsive to said first and second information" (Claims 19-20)**

| Claim Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| **"means for assembling, at said server system, said second computer readable code module, said second computer readable code module containing a service response related to said Web page, said second computer readable code module being responsive to said first and second information"** (Ex. 1, claims 19, 20) | **Function:** assembling, at said server system, said second computer readable code module, said second computer readable code module containing a service response related to said Web page, said second computer readable code module being responsive to said first and second information. **Structure:** a computer programmed with special purpose software modules to execute an algorithm, which includes the steps of: (1) receiving at a server system a first command communicated over a network from a client machine; (2) receiving at the server system a Web address of a Web page accessed by the client machine and communicated via the first command; (3) receiving at the server system first information characterizing a Web browser and second information characterizing a client machine; and (4) executing instructions to assemble a second code module with a service response responsive to the first and second information, and structural equivalents thereof. | **Function:** assembling, at said server system, said second computer readable code module, said second computer readable code module containing a service response related to said Web page, said second computer readable code module being responsive to said first and second information. **Structure:** The '691 Patent lacks any adequate disclosure of corresponding structure for this limitation. Additionally, the claims including this limitation are inoperative. Accordingly, the claims including this limitation are invalid for indefiniteness under 35 U.S.C. § 112 ¶ 2. |

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

## A.    Arguments

Augme asserts that the patent specification discloses an "algorithm to perform the claimed function of 'assembling, at said server system, said second computer readable code module, said second computer readable code module containing a service response related to said Web page, said second computer readable code module being responsive to said first and second information.'" Augme Br. at 21.  In support, Augme provides the following disclosures:

| Step | Patent Specification Citation |
| --- | --- |
| 1 | FIG. 1 shows a block diagram of a computer network 20 in accordance with a preferred embodiment of the present invention.  Computer network 20 includes a first processor platform 22, a second processor platform 24, and a server system 26. (Ex. 1 at 3:37-41.) … |
| | Task 124 causes processor 62 (FIG. 1) of server system 26 to receive first command 93 (FIG. 3). *Id.* at 6:39-40. |
| 2 | At task 126, server system 26 receives Web address 38 communicated by second processor platform 24 at task 118 (FIG. 3) of display process 110 (FIG.3). *Id*. at 6:42-44. |
| 3 | Task 190 causes processor 62 (FIG. 1) to receive browser information 56 (FIG. 1) and platform information 58 (FIG. 1) from second processor platform 24 (FIG. 1). *Id.* at 9:41-43. |
| 4 | [S]econd code module 90 is assembled in response to browser information 56 and platform information 58. In other words, second code module 90 is assembled to include the service response and to work with any combination of browser/platform systems. *Id.* at 11:66-12:3. |

Augme argues that "based at least on this disclosure, one of ordinary skill in the art would readily discern the disclosed algorithm for performing the claimed function."  Augme Br. at 21. Augme further argues that "a person of ordinary skill in the art at the time of the invention would have known how to program a computer system to perform each step of the disclosed algorithm." Augme Br. at 22 (citing Keller Decl. ¶ 33).

Yahoo! responds that although claim 19 recites a "computer readable code module" that executes on the web surfer's computer and "includ[es]" "means for assembling, at said server system, said second computer readable code module," the patent discloses no structure that both "is part of the first code module *and* performs the assembly."  Yahoo! Resp. Br. at 22.  Yahoo! argues that the only structure that is disclosed for assembling is "assembler instructions" at the server.  *Id.*

1  (citing Ex. A at 4:33-47) ("Server system" "includes" "code assembler instructions"), 11:60-61

2  ("server's processor "execut[s] code assembler instructions").  Yahoo! further asserts that the

3  assembler instructions are not part of the first code module, and indeed, could not be, because the

4  first code module executes on the client, not the server.  *Id.* at 6:10-14.  Thus, there is no structure

5  disclosed in the specification for "assembling" that is part of the first code module, and therefore the

6  claim limitation is indefinite.  *Id* at 23 (citing *Cardiac Pacemakers Inc.*, 296 F.3d at 1119).

7        Yahoo! further argues that this limitation also renders claim 19 "nonsensical and

8  contradictory."  Yahoo!'s Resp. Br. at 23.  Claim 19 claims a first code module, executing on a

9  "client," that includes assembly means.  But this limitation further states that the assembly function

10 is performed "at said server system."  Yahoo! argues that this makes no sense and that Augme's

11 expert, Dr. Keller was unable to explain how this claim language worked.  *Id.*  Rather, according to

12 Yahoo! "Dr. Keller attempted to reinterpret the claim language so that the first code module does not

13 'includ[e]' the assembly means — directly contradicting the claim language."  *Id.* (citing Ex. F at

14 170:16- 172:4). Yahoo! therefore concludes that a skilled artisan would have no idea what was

15 claimed.  *Atmel Corp. v. Info. Storage Devices, Inc.*, 198 F.3d 1374, 1382 (Fed. Cir. 1999)

16 (specification must allow skilled artisan to "know and understand" the corresponding structure).

17       Yahoo! argues that Augme's proposed algorithm cannot save this limitation.  Yahoo! points

18 out that Augme's steps 1 and 4 recite "receiving at a server system a first command" and "executing

19 instructions to assemble a second code module."  Yahoo!'s Resp. Br. at 23.  This proposed algorithm

20 essentially rewrites the claim so that the first code module commands assembly of the second code

21 module at the server, instead of assembling the second code module.  But that is not what is claimed.

22 Citing *Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004), Yahoo! argues

23 that a party "may not redraft claims, whether to make them operable or to sustain their validity,"

24 through claim construction.

25       Finally, Yahoo! argues that the claim is indefinite for an additional reason – the specification

26 discloses no algorithm for assembling the second code module.  Yahoo!'s Resp. Br. at 23.  Yahoo!

27 points out that the only disclosure of assembly is the following passage:

28       Task 238 causes processor 62 to execute code assembler instructions 86 (FIG. 1) to assemble
      second code module 90.  Second code module 90 is assembled by accessing the
      predetermined one of denial of service response 162 (FIG. 7), conditional service response
      176 (FIG. 7), and predetermined service response 186 (FIG. 7) from Web address database

68. In addition, second code module 90 is assembled in response to browser information 56 and platform information 58. In other words, second code module 90 is assembled to include the service response and to work with any combination of browser/platform systems.

*Id.* (citing Ex. A at 11:60-12:3). According to Yahoo!'s expert, nothing in this passage discloses an algorithm for assembling the second code module. Nutt Decl. ¶ 9. The passage refers to "accessing," but accessing is not assembling. Although the passage describes the outcome of the assembly, that is not enough. *See Aristocrat*, 521 F.3d at 1334 (description of "outcome of performing the function" is insufficient).

Augme argues in its reply that Yahoo!'s argument is premised upon a fundamental misunderstanding of claim 19. Augme Reply at 14. Yahoo! contends that claim 19 requires "assembly" by the first code module, but the claim reveals no such limitation. Claim 19 requires a "computer readable code module" to provide the means to enable the server system (not the first code module) to assemble the second computer readable code module. Ex. 1 at 16:42-58. The structure for providing the means to assemble the second code module at the server system is set forth in the specification. The specification discloses that a computer readable code module provides information (*i.e.*, the Web address, browser, and platform information) to the server system so that the server system can assemble a second computer readable code module. Ex. 1 at 6:15-28.

Augme argues that the patent, "which devotes numerous figures and columns of text describing the assembly process, provides ample description." Augme Reply at 14-15 (citing Ex 1 at 6:36-12:3); *Finisar Corp. v. DirecTV Group, Inc.*, 523 F.3d 1323, 1340 (Fed. Cir. 2008) (an algorithm may be expressed in any terms understandable to one skilled in the art including as a mathematical formula, in prose, or in a flow chart). Augme points out, for example, that "FIG. 5 shows a flow chart of a service response provision process 122 performed by server system 26 (FIG.1)…." *Id.* at 15 (citing Ex. 1 at 6:36-38). According to Augme "[t]his figure (and corresponding text) along with subsequently referenced figures (and text) describe how the server system forms a service response. Then, the specification describes how the second code module is assembled with the service response." *Id.* (citing 11:60-12:1). Augme points out that "[t]he specification also provides support describing the software code used to perform the aforementioned algorithm." *Id.* at 4:51-60.

**B.      Analysis**

The claims containing this term are indefinite.  As an initial matter, the Court concludes that Augme is incorrect in its interpretation of Claim 19.  The preamble to claim 19 says: "A computer readable code module for adding function to a Web page. . . . *said computer readable code module including . . .   means for assembling*, at said server system, said second computer readable code module. . ."  Ex. 1, 16:41-42; 56-57 (emphasis added).  The "computer readable [first] code module" is supposed to "include" the means for assembling, yet the claim language goes on to say that the assembling occurs *at the server system*.  To the extent that there is any disclosure of a structure that is a "means" for assembling, it is the assembler at the server – not any part of the first code module.

At the deposition of Augme's expert, Dr. Keller, he was asked:  "So the means for assembling is, in fact, not done by the computer readable code module that's being described up here in the preamble?"  Ex. F at 172:5-7.  Dr. Keller responded: "It – the means for assembling is done at at [sic] said server systems, it says here."  *Id.* at 172: 8-9.  The attorney then asked: "Would you agree that it wouldn't make any sense to have a means for assembling at said server system within the code module embedded in the web page at the client machine?  Would that make any technical sense to you?"  *Id.* at 172:10-14.   Dr. Keller responded (in part):

> My understanding is that somebody reading Claim 19 would understand the steps that involve the readable code module are included are the ones that are out-dented, the six of those, as they start, and that this means for assembly, as in – as being the continuation of the means for communicating second information characterizing said client machine to said server system, that that second means there is intended to be listed that way so that it's clear that it's not a. . . ."

*Id.* at 172 (quote ends mid-sentence, because that is all that was provided of this deposition transcript).  Even though this testimony ends mid-sentence, the Court understands Yahoo!'s argument to mean that Augme's expert Dr. Keller is essentially trying re-write the claim language with his answer in order to read the "means for assembly" as merely part of the "means for communicating" which is indeed part of the first code module.  This argument does not answer the criticism: there is simply no structure disclosed that is part of the first code module, which is a means for assembly on the server.

The claim is indefinite for another reason – there is no structure disclosed for *how* the second code module is assembled.  As Yahoo! correctly notes, the only passage regarding "assembly"

1  describes the outcome of the assembly, not an algorithm for performing the assembly, which is not

2  enough.  *See Aristocrat*, 521 F.3d at 1334 (description of "outcome of performing the function" is

3  insufficient).  Accordingly, the Court finds that claims containing this limitation are indefinite.

> **10.** **"Means for communicating said second code module to said second processor platform, such that upon retrieving said second code module, said first code module issues a second command to initiate execution of said second code module at said second processor platform."**

| Claim Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| **Means for communicating said second code module to said second processor platform, such that upon retrieving said second code module, said first code module issues a second command to initiate execution of said second code module at said second processor platform."**<br><br>(Ex. 1, claims 21, 25) | **Function:** communicating said second code module to said second processor platform, such that upon retrieving said second code module, said first code module issues a second command to initiate execution of said second code module at said second processor platform.<br><br>**Structure:** a computer programmed with special purpose software modules to execute an algorithm, which includes the steps of: (1) communicating a second code module from the server system to the second processor platform via a network connection; (2) downloading the second code module to temporary memory at the second processor platform; and (3) issuing a command from the first code module to initiate execution of the second code module by the Web browser, and structural equivalents thereof. | **Function:** communicating said second code module to said second processor platform, such that upon retrieving said second code module, said first code module issues a second command to initiate execution of said second code module at said second processor platform.<br><br>**Structure:** A server system programmed to communicate the second code module to the second processor platform via a network connection, such that upon receiving the second code module the second processor platform (1) stores the second code module in temporary memory, and (2) executes a command line within the first code module to initiate the execution of the second code module.4 (Ex. 8.) |

### A.   Arguments

Unlike the other "communicating" terms, the parties agree that a sufficient structure is disclosed.  They disagree, however, in their description of the structure.  To put this phrase into simple terms, as discussed previously, the first code module issues two commands: one that directs the end user's computer to "retrieve" a "second code module" from the server, and one that directs

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1  the second code module to execute after it is downloaded.  The disputed term addresses the second

2  command.

3          Augme asserts that the patent specification discloses the structure for the algorithm to

4  perform the claimed function of "communicating said second code module to said second processor

5  platform, such that upon retrieving said second code module, said first code module issues a second

6  command to initiate execution of said second code module at said second processor platform."

7  Augme cites to the following:

| Step | Patent Specification Citation |
|------|------|
| 1 and 2 | Second code module 90 is communicated from ports 78 over Internet 28 and downloaded to temporary memory 54 at second processor platform 24.  Ex. 1 at 4:58-60. |
| 3 | Fourth command line 104 contains a second command 106 that initiates execution of second code module 90 that was downloaded to temporary memory 54 of second processor platform 24.  *Id.* at 5:23-26. |

13         Augme repeats its argument that "based at least on this disclosure" one of ordinary skill in

14  the art would readily discern the disclosed algorithm for performing the claimed function of

15  "communicating said second code module to said second processor platform, such that upon

16  retrieving said second code module, said first code module issues a second command to initiate

17  execution of said second code module at said second processor platform."  Keller Decl. ¶34.  A

18  person of ordinary skill in the art at the time of the invention "would have known how to program a

19  computer system to perform each step of the disclosed algorithm."  *Id.* at ¶ 38.

20         Augme argues that Yahoo!'s latest proposed algorithm is not supported by the claim

21  language, specification, or file history.  First, Yahoo!'s proposed algorithm fails to include the step

22  of "communicating said second code module to said second processor platform," which is required

23  by the claim.  Thus, Augme argues, Yahoo!'s algorithm fails to disclose enough of an algorithm to

24  provide the necessary structure under §112, ¶6.  Augme's Br. at 23 (citing *Finisar Corp. v. DirecTV*

25  *Groupf, Inc.*, 523 F.3d 1323, 1340 (Fed. Cir. 2008)).

26         Next, Augme argues that Yahoo!'s proposed algorithm also fails because the steps that it

27  *does* identify are also not supported by the claim language, specification, or file history.  Yahoo!

28  requires that "the second processor platform … (2) executes a command line within the first code

module to initiate the execution of the second code module."  Augme's Br. at 23-24.  However,

United States District Court

For the Northern District of California

1   Augme asserts, there is no requirement that the second processor platform execute a command line –

2   the claim reads "said first code module issues a second command to initiate execution of said second

3   code module at said second processor platform."  *Id.*

4        Augme further asserts that Yahoo!'s definition would require execution of "a command

5   line," which would improperly read in a limitation to the claim.  There is no requirement that there

6   be "a command line" only "a second command."  Augme points out that Yahoo!'s proposed

7   definition also requires the execution of the command line "within the first code module" which it

8   again argues results in limitations being read into the claim.  The claim requires "said first code

9   module issues a second command," and there is no requirement that the second command be *within*

10  the first code module.  Because Yahoo! reads in limitations to the claim, Augme argues, Yahoo!'s

11  definition is improper.  Augme's Br. at 24.

12       Yahoo! responds that its "algorithm clarifies that the second command to initiate execution

13  of the second code module is issued by a command line in the first code module.  This is the only

14  disclosed structure for the second command."  Yahoo! Resp. Br. at 25 (citing Nutt Decl. ¶ 10).

15  Yahoo! also argues that Augme's citation to the specification confirms this, as it explains that the

16  "[f]ourth command line 104 [in the first code module] contains a second command."  *Id.* (citing

17  Augme Br. at 23).  Yahoo! points out that Augme's algorithm is inadequate for its third algorithmic

18  step simply restates the recited function.  *Finisar*, 523 F.3d at 1340.

19       Yahoo! makes the following arguments in an effort to refute Augme's challenges to

20  Yahoo!'s proposed algorithm.  First, responding to Augme's argument that Yahoo! omits the step of

21  "communicating" the second code module, (Yahoo! Resp. Br. at 25) (citing Augme Br. at 23),

22  Yahoo! asserts that its proposed algorithm expressly refers to "[a] server system programmed to

23  communicate the second code module to the second processor platform."  *Id.*  Second, Yahoo!

24  disputes Augme's claim that Yahoo!'s construction "improperly reads" a command line "within the

25  first code module" into the claim.  Augme Br. at 24.  Yahoo! argues that the specification discloses

26  that the "second command" is a "command line" within the first code module.  Ex. A at 5:23-26,

27  12:41-45, Fig. 2 Line 4.  For example, the specification demonstrates that the "second command" is

28  a line of code that is contained within the first code module:

Task 246 causes Web browser 52 (FIG. 1) to execute third command line 100 (FIG. 2) of
first code module 36 containing comment tag 102.  In addition, task 246 causes Web browser

52 to execute fourth command line 104 (FIG. 2) of first code module 36 issuing second command 106 to initiate the execution of second code module 90.

'691 Patent at 12:39-44.  Rather than improperly reading a limitation into the claim, Yahoo! argues that the second command is limited to that structure under 35 U.S.C. § 112 ¶ 6.

Augme responds that the heart of the dispute on this term is the parties' disagreement over the construction of the term "code module."  Because Yahoo! argues that "code module" must mean contiguous lines of code, and Augme asserts that there is no such claim limitation, the parties dispute whether the second command is *in* the first code module.  Augme Reply at 15.

Augme points out that "Yahoo!'s brief seeks to emphasize that the second command is *in* the first code module."  Augme Reply at 15 (citing Yahoo! Resp. Br. at 25) (emphasis added).   Under such a definition, Yahoo! argues that unless the second command is part of the selected contiguous lines of code designated as the first code module, it is not *in* the first code module.  Augme argues that such a construction is incorrect because the patents do not require contiguous lines of code. Therefore, Augme argues that its algorithm reflects this and is the only correct one.

### B.    Analysis

The patent is clear that the "the first code module issues a second command."  The  patent specification also confirms that the first code module contains the code that issues the second command.  Whether or not the patent requires contiguous lines of code, it is clear that the code that issues the second command is part of the first code module.

Regarding Augme's argument that Yahoo!'s proposed algorithm improperly requires that "the second processor platform … (2) executes a command line within the first code module to initiate the execution of the second code module," this position has merit.  As Augme points out, there is no requirement that *the second processor platform* execute a command line; rather, the claim reads "said first code module issues a second command to initiate execution of said second code module *at said second processor platform*."  Augme Br. at 23-24 (emphasis added).  Yahoo! does not address Augme's argument on this point in its brief.

Accordingly, the Court adopts a modified version of Augme's proposed construction as follows – A computer programmed with special purpose software modules to execute an algorithm, which includes the steps of: (1) communicating a second code module from the server system to the

United States District Court

For the Northern District of California

second processor platform via a network connection; (2) downloading the second code module to temporary memory at the second processor platform; and (3) issuing a command from within the first code module that initiates execution of the second code module, and structural equivalents thereof.

## VI.   CONCLUSION

For the reasons stated above, the Court adopts the following claim constructions:

| Claim Term | Court's Construction |
|---|---|
| 1. "to add function to a webpage" | "to add software to a web page that is capable of performing or administering a service or activity." |
| 2. "Embedded in said webpage" and "embedded therein" | "written into the html code of the web page" |
| 3. "service response" | "a response that indicates whether the downloaded web page is permitted to have access to a requested function, and if yes, how the function should be presented on the web page." |
| 4. "code module" | "computer program instructions for performing specific computing tasks" |
| 5. "In response to said first and second information" and "responsive to said first and second information" and "in response to said information" | "using said first and second information." |
| 6. "initiating execution of said second code module" | "causing to begin execution of a code module." |
| 7. "means for communicating a Web address of said Web page to a server system via a network connection to initiate a download of a second computer readable code module to said client machine" | Indefinite. |
| 8. "means for communicating first information characterizing said Web browser to said server system" | Indefinite. |
| 9. "means for assembling, at said server system, said second computer readable code module, said second computer readable code module containing a service response related to said Web page, said second computer readable code module being responsive to said first and second information." | Indefinite. |

United States District Court

For the Northern District of California

| | |
|---|---|
| 10. "means for communicating said second code module to said second processor platform, such that upon retrieving said second code module, said first code module issues a second command to initiate execution of said second code module at said second processor platform." | a computer programmed with special purpose software modules to execute an algorithm, which includes the steps of: (1) communicating a second code module from the server system to the second processor platform via a network connection; (2) downloading the second code module to temporary memory at the second processor platform; and (3) issuing a command from **within** the first code module **that initiates** execution of the second code module, and structural equivalents thereof. |

    IT IS SO ORDERED.

Dated: September 13, 2011


                                    _____
                                    JOSEPH C. SPERO
                                    United States Magistrate Judge